# EXHIBIT B

# COWAN SYSTEMS. LLC

# INDEPENDENT CONTRACTOR OPERATING AGREEMENT

Rev. 08/23/12

*THIS AGREEMENT CONTAINS INDEMNIFICATION PROVISIONS, WHICH ARE HIGHLIGHTED IN BOLDFACED UNDERLINED TYPE.*

## Cowan Systems, LLC
## INDEPENDENT CONTRACTOR OPERATING AGREEMENT

Cowan Systems, LLC ("CARRIER"), an authorized motor carrier, and the undersigned independent contractor ("CONTRACTOR"), in consideration of the covenants and agreements contained herein and pursuant to the federal leasing regulations under 49 C.F.R. Part 376, enter into this Independent Contractor Operating Agreement, including any appendixes and addenda ("Agreement").

## 1.   PROVISION OF SERVICES AND EQUIPMENT.

**1(a).   CONTRACTOR's Services and Equipment.** During the term of this Agreement, CONTRACTOR shall provide CARRIER professional truck driving services, other incidental transportation related services, and the use of the equipment set forth in Section 1 of Appendix A (CONTRACTOR Election Form) or as supplemented in an addendum (the "Equipment"). CONTRACTOR represents and warrants that CONTRACTOR has title to or is authorized to contract the Equipment and services to CARRIER. Upon taking possession of the Equipment from CONTRACTOR, CARRIER shall furnish to CONTRACTOR a receipt for Equipment, which shall constitute the receipt required by 49 C.F.R. § 376.11(b). Upon termination of this Agreement, CONTRACTOR shall execute a similar receipt for equipment as the written receipt for the return of the Equipment by CARRIER to CONTRACTOR; provided, however, that this Agreement and CARRIER's obligations thereunder shall expire upon the written notice of termination regardless of whether CONTRACTOR submits the receipt required under this provision.

**1(b).   No Guarantees or Limitations.** CARRIER does not guarantee any specific number of shipments or amount of revenue to CONTRACTOR or to use the Equipment at any particular time or location during the term of this Agreement. CONTRACTOR is free to accept or reject any specific shipment offered by CARRIER. CONTRACTOR is not prohibited from entering into separate agreements to provide equipment and other professional truck drivers not identified as Equipment above or in an appendix and drivers not used to service this Agreement, to other motor carriers. Nor is CONTRACTOR, consistent with Section 15(b) of this Agreement, prohibited from using the Equipment for the pick up, transportation, or delivery of property for more than one motor carrier or any other person or entity.

## 2.   DURATION AND TERMINATION OF AGREEMENT.

**2(a).   Commencement and Termination.** This Agreement shall begin on the Effective Date, and end on the Termination Date, indicated in the "In Witness Whereof" paragraph just above the signature block below. Either party may terminate this Agreement immediately, in accordance with the procedures in Subsection (b) of this Section, for any of the reasons set forth in that Subsection. In addition, either party may terminate this Agreement at any time for any reason by giving fifteen (15) days' written notice to that effect to the other party personally, by mail, by fax machine at the address or fax number shown at the end of this Agreement, or, if both parties have signed Appendix C, by the electronic means specified in that appendix. The effective date and time of termination shall be as set forth in the written notice given by either party, or on the receipt for the Equipment if one is issued by CONTRACTOR to CARRIER, or at the date and time when, as a practical matter, possession of the Equipment by Carrier pursuant to 49 C.F.R. § 376.11(b)(2) ends, whichever of these  three dates/times is earliest.

**2(b).   Reasons for Unilateral Termination by a Party.** Notwithstanding anything to the contrary in this Agreement, in the event of (1) a party's engaging in, or attempting, conspiring, or threatening to engage in, any act or omission that would constitute a felony or intentional tort, pursuant to Section 8 of this Agreement; (2) CONTRACTOR's violation of, or failure to fully adhere to and perform, the requirements of (A) any customer of CARRIER pursuant to Section 8(h) of this Agreement, (B) any applicable federal, state, local, and foreign authorities, including but not limited to DOT, state, provincial, or local highway safety, vehicle inspection, vehicle maintenance, traffic, road, truck size-and-weight, hazardous materials transportation, cargo security, or other laws and regulations ("Applicable Law"), (C) CARRIER's operating authorities, or (D) CARRIER Policies and Procedures, all pursuant to Sections 8(a) and (f) of this Agreement; (3) CONTRACTOR's in whole or in part causing an "accident," as that term is defined by FMCSA in 49 C.F.R. § 390.5, pursuant to Section 8(f) of this Agreement; or (4) any other material breach of this Agreement by either party, the other party may elect to terminate this Agreement by giving immediate oral (but only if the other party is reachable in person or by telephone), followed by written, notice of termination to the breaching party. In addition, Section 16(f)(3) of this Agreement provides, among other things, that either party may unilaterally terminate this Agreement on one day's notice if and when an initial decision is issued by a court or administrative agency reclassifying CONTRACTOR from independent-contractor to employee status.

**2(c).   CONTRACTOR's Obligations Upon Termination.** CONTRACTOR shall, upon the termination of this Agreement  or the completion of the transportation or other services provided for herein, whichever occurs later, remove all CARRIER identification from the Equipment and return it, or a letter certifying the removal, to CARRIER, via hand delivery, overnight express service, or certified mail, together with all of CARRIER's property, including trailers,

permits and other paperwork, load securement equipment, and freight, to CARRIER's nearest terminal and pay CARRIER all amounts CONTRACTOR owes CARRIER at that time under this Agreement. If CONTRACTOR fails to return CARRIER's property or freight to CARRIER, or remove and return all CARRIER identification (or deliver to CARRIER a letter certifying its removal), upon termination of this Agreement, CONTRACTOR shall pay CARRIER all expenses incurred by CARRIER in seeking the return of such items, including reasonable attorney fees and collection costs, and CARRIER may pursue all other remedies allowed by law or authorized in this Agreement against CONTRACTOR.

**2(d). Survival of Liabilities and Entitlements.** If, up to and including the date of termination, one or more events occur that give rise, before or after that date, to a liability or entitlement of CONTRACTOR or CARRIER under this Agreement, such liability or entitlement shall continue, notwithstanding the termination of this Agreement, until such liability or entitlement is satisfied in full.

**3. GROSS COMPENSATION.** CONTRACTOR's gross compensation shall be as set forth in Appendix B (CONTRACTOR Compensation Rates), and such gross compensation shall constitute the total compensation for the use of the Equipment and for everything furnished, provided, done by, or required of CONTRACTOR in connection with this Agreement, including but not limited to driving of the Equipment and all non-driving activities such as conducting pre- and post-trip inspections of the Equipment, waiting to load or unload (detention), loading or unloading if required, fueling, repairing and maintaining the Equipment, hooking and unhooking empty trailers, preparing logbooks and other paperwork, and other activities and services. [As indicated in Section 9 (CONTRACTOR's Operating Expenses) and Section 5 (Charge-Backs) of this Agreement, CONTRACTOR – as an independent contractor, not an employee – agrees to pay all of its operating expenses (including but not limited to those that CARRIER initially advances and later charges back to CONTRACTOR) out of the gross compensation provided under this Section and Appendix B (CONTRACTOR Compensation Rates) and any other CONTRACTOR moneys. **Under no circumstances shall CARRIER be responsible for such operating expenses.**

**4. SETTLEMENT PERIOD AND DOCUMENTATION.**

**4(a). Settlement.** CARRIER shall settle with CONTRACTOR, paying CONTRACTOR any Settlement Compensation, as defined in Section 5(a) of this Agreement, within 15 days after CONTRACTOR's submission of properly completed logs required by the Federal Motor Carrier Safety Administration ("FMCSA") of the U.S. Department of Transportation ("DOT"), owner manifest, and those documents necessary for CARRIER to secure payment from its customers, including the signed freight bill, delivery receipt, or bill of lading, concerning a trip in the service of CARRIER under this Agreement. All paperwork should be submitted weekly no later than Sunday night in order to allow processing for the next week's settlement. At each weekly settlement, CARRIER shall directly or through an agent hand-deliver or send to CONTRACTOR, by fax, email, or U.S. First Class Mail to the address required by Section 23 (Notices) of this Agreement, a statement detailing all debit and credit entries since the preceding statement ("Settlement Statement").

**4(b). Documentation.** Where CONTRACTOR is paid a percentage of revenue, CARRIER will provide CONTRACTOR with a copy of the rated freight bill or a computer-generated document that contains the same information, or, in the case of contract carriage, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill before or at the time of settlement. Regardless of the method of compensation, CONTRACTOR shall be permitted to examine CARRIER's tariffs, or other contracts or documents, if any, from which rates and charges are computed and documents underlying any computer-generated document, at CARRIER's main headquarters during normal business hours. If rates and charges are computed from a contract, CONTRACTOR is entitled to examine only those portions of the contract containing the same information as would appear on a rated freight bill. CARRIER may delete the names of shippers and consignees shown on the freight bill or other form of documentation. CARRIER shall have the right, but not as a condition of settlement and payment, to review all of CONTRACTOR's documents and records relating to the use of the Equipment and the services provided under this Agreement and CONTRACTOR agrees to provide CARRIER with access to such documents and records upon reasonable notice.

**4(c). Removal of Identification.** With respect to final settlement upon termination of this Agreement, the failure on the part of CONTRACTOR to remove and return to CARRIER all identification devices of CARRIER or a letter certifying their removal shall entitle CARRIER to withhold any compensation payments owed to CONTRACTOR until such obligation is met.

**5. CHARGE-BACKS.**

**5(a). Deductions Table.** CARRIER shall deduct from CONTRACTOR's gross compensation under Section 3 of this Agreement, from CONTRACTOR'S Escrow Fund, or from other amounts CARRIER owes CONTRACTOR, at the time of settlement with CONTRACTOR, amounts that, under this Agreement or any addendum, CONTRACTOR owes

CARRIER, as set forth in the Deductions Table immediately below and in Section 3 of Appendix A (CONTRACTOR Election Form) of this Agreement, resulting in a net amount, if any, to be remitted to CONTRACTOR ("Settlement Compensation"). Instead of or in addition to making the deductions authorized by the Deductions Table and Section 3 of Appendix A, CARRIER shall have a right to recover, through collection agencies, litigation, arbitration, the right of setoff, and all other available legal means, any such amounts CONTRACTOR owes, or comes to owe, CARRIER under this Agreement. From time to time, CONTRACTOR may be permitted by CARRIER to purchase fuel, products or services, including repairs that are charged to CARRIER.   When CONTRACTOR does so, CONTRACTOR hereby authorizes CARRIER to deduct or otherwise recover from CONTRACTOR pursuant to this Section of this Agreement amounts equal to such charges. CONTRACTOR is never to charge any amounts to CARRIER's account – or execute or endorse any negotiable instrument for or on behalf of CARRIER – without CARRIER's express written permission in advance, and CONTRACTOR and CARRIER shall not incur or authorize any other debts in the name of the other.

| CHARGE-BACK OR DEDUCTION ITEM | AMOUNT, OR METHOD OF COMPUTATION, OF DEDUCTION |
|---|---|
| Advance check | If CONTRACTOR elects, with CARRIER's prior written consent, to use a CARRIER advance check to pay any of CONTRACTOR's expenses under this Agreement, CARRIER shall charge back the amount advanced, plus a per-transaction fee consisting only of the fee charged by issuer of CARRIER's advance checks in an amount set forth in Section 3 of Appendix A (CONTRACTOR Election Form). |
| Advances of CONTRACTOR's compensation loaded onto CARRIER's Advance Card for CONTRACTOR's use | Amount CARRIER advanced to CONTRACTOR (loaded onto CARRIER's Advance Card) at CONTRACTOR's request, plus a per transaction fee consisting only of the fee charged by issuer of CARRIER's Advance Card, in an amount set forth in Section 3 of Appendix A (CONTRACTOR Election Form), whenever CONTRACTOR elects to use the card for a purchase. |
| Alternative Use of Equipment payment to CARRIER if CONTRACTOR fails to make such payment to CARRIER within twenty (20) days of completion of a trip pursuant to § 15(b) of this Agreement | See § 15(b)(2)(B) of this Agreement and the percentages set forth in Section 3 of Appendix A (CONTRACTOR Election Form) |
| Claims - Damages, losses, fines, penalties, court costs, attorneys' fees, and other expenses (together "Damages") that CARRIER pays or otherwise incurs arising out of or in connection with CONTRACTOR's negligence, gross negligence, willful misconduct, or other culpable acts or omissions under this Agreement, pursuant to § 13(a), subject to indemnity limits set forth in Agreement § 13(b) | Amount CARRIER paid or otherwise incurred, subject to indemnity limits set forth in § 13(b), if applicable |
| C.O.D. charges | Amount of freight revenue from shippers, sublease carriers, or others not collected, or collected but not remitted, by CONTRACTOR to CARRIER when such actions were required by this Agreement |
| Communications equipment - Charges for loss of or damage to communications, tracking equipment, and Mobile in-cab scanner under Agreement, §§ 9(g)(2) and (3), if CONTRACTOR elects, by so indicating in Appendix A (CONTRACTOR Election Form), § 4(b), to have CARRIER furnish and install such equipment, of CARRIER's choosing, in CONTRACTOR's tractor EQUIPMENT | Amount paid to third-party vendor or otherwise incurred by CARRIER |
| | |

| CHARGE-BACK OR DEDUCTION ITEM | AMOUNT, OR METHOD OF COMPUTATION, OF DEDUCTION |
|---|---|
| Communications messaging usage fee for unlimited messaging using communications and tracking equipment pursuant to Appendix A, § 4(b) | Amount set forth in Appendix A (CONTRACTOR Election Form), § 3. |
| Detention, accessorial, and other customer-charge revenue not collected by CARRIER from its customer because of CONTRACTOR's failure to transmit to CARRIER the necessary documentation supplied by the shipper or consignee | Amount CARRIER was unable to collect from customer as a result of CONTRACTOR's failure to transmit to CARRIER the necessary documentation supplied by the customer, provided that no charge-back shall be made to CONTRACTOR if he/she contacted CARRIER's dispatch regarding issue prior to departure from customer (consignor or consignee) location |
| Earnings Adjustment, pursuant to Appendix B (CONTRACTOR Compensation Rates), § 3 | See Appendix B, § 3 |
| Engine heater plug-ins | Amount CARRIER paid outside vendor |
| Equipment purchase/rental | See Addendum for Equipment Lease and/or Rental Charges |
| Escort fee pursuant to Agreement § 8(a)(2) if CONTRACTOR's driver lacks a TWIC and therefore needs a suitably-credentialed escort in order to make a pickup or delivery at a port | Amount CARRIER paid to escort |
| Escrow Fund contributions | See Agreement § 7(a) and Appendix A (CONTRACTOR Election Form), § 3 |
| Express mail, U.S. First Class Mail, or other package delivery services if CONTRACTOR charges them to CARRIER's account with the delivery service vendor | Amount CARRIER paid to U.S. Postal Service or other package delivery service vendor |
| Fines and penalties, including traffic tickets and related court costs, attorneys' fees, and other legal expenses, that Agreement §§ 9(c) and (d) make CONTRACTOR responsible for | Amount CARRIER paid or otherwise incurred |
| Fuel and oil purchases that CONTRACTOR elects to make using CARRIER's Advance Card | For fuel and oil purchases that CONTRACTOR elects to make from third-party fuel vendors using CARRIER Advance Card, CARRIER shall deduct (and show on CONTRACTOR's Settlement Statement) or otherwise recover pursuant to Agreement § 5(a) an amount computed by multiplying the number of gallons or other units purchased by a price per unit no greater than the price posted at the fuel vendor's facility. The amount deducted, if less than the posted price, is the result of a discount to CONTRACTOR that CARRIER has negotiated with the fuel vendor or Card issuer. If CARRIER receives any additional discount on CONTRACTOR's fuel or oil purchases or if the fuel and oil purchases of all CARRIER's contractors combined reach certain volumes and result in CARRIER's receiving rebates from some fuel vendors, CARRIER shall retain 100% of such discounts and rebates. |
| Fuel and mileage taxes and fuel tax reporting | See Agreement § 9(f) and Appendix A (CONTRACTOR Election Form), § 2(b) |
| Garnishment orders (including but not limited to child- | Amount CARRIER paid in compliance with any lawfully |

| CHARGE-BACK OR DEDUCTION ITEM | AMOUNT, OR METHOD OF COMPUTATION, OF DEDUCTION |
|---|---|
| support payments and IRS levies) | issued order or lien, a copy of which CARRIER shall supply to CONTRACTOR at or before the first deduction relating to it, plus an admin. fee to CARRIER in the amount set forth in Section 3 of Appendix A (CONTRACTOR Election Form). After termination of, but not during, this Agreement, CARRIER shall deduct from CONTRACTOR's Escrow Fund (after all deductions authorized by this Deductions Table) the portion of any garnishment or lien amount due that exceeds the balance in CONTRACTOR's Settlement Compensation. |
| Insurance coverages CONTRACTOR elects, via the CERTIFICATE OF INSURANCE in Appendix A (CONTRACTOR Election Form), § 5(b), to have CARRIER facilitate or that CARRIER maintains at its expense because CONTRACTOR failed to provide proper evidence of the purchase or maintenance of the required coverages under Agreement, § 6(d) | See Appendix A (CONTRACTOR Election Form), §§ 3, 5(b) |
| Licensing (Base Plate) fees if CONTRACTOR elected, by so indicating in Appendix A (CONTRACTOR Election Form), § 2(a), to have CARRIER pay the fees in advance | See Agreement § 9(e)(1) and Appendix A (CONTRACTOR Election Form), § 2(a) |
| Licensing (permit) fees under Appendix A (CONTRACTOR Election Form), § 2(b) | See Agreement § 9(e)2) and Appendix A (CONTRACTOR Election Form), § 2(b) |
| Load locks if CONTRACTOR elects to purchase these through CARRIER | Amount CARRIER paid outside vendor |
| Loan payments if CONTRACTOR elects, with CARRIER's consent, to borrow an amount from CARRIER to cover cost of maintenance, repairs, or other expenses | Weekly payments based on principal and interest agreed to by CONTRACTOR and CARRIER, as reflected in Addendum for CARRIER Loan |
| Maintenance, repairs, parts, and replacement tires for Equipment if CONTRACTOR elects, and CARRIER each time agrees, to have CARRIER advance funds for the purchase and charge CONTRACTOR back for it | Amount CARRIER paid outside vendor. If CONTRACTOR elects to pay the outside vendor directly, using a CARRIER advance check, see "Advance Check" row above |
| Medical examinations to the extent Agreement § 8(d) requires CONTRACTOR to pay for them | Amount CARRIER paid outside vendor |
| Motel guestroom and other charges if CONTRACTOR elects to have CARRIER advance such charges | Amount CARRIER paid outside vendor |
| Motor vehicle reports requested or required by CONTRACTOR | Amount set forth in Appendix A (CONTRACTOR Election Form), § 3 |
| Non-exchanged pallets | Amount CARRIER paid its customers for non-exchanged pallets |
| Operating expenses not otherwise listed in this table for which CONTRACTOR is responsible under this Agreement and regarding which CARRIER receives a purchase order or invoice or is otherwise requested by CONTRACTOR to make an expenditure in the first instance | Amount CARRIER paid or otherwise incurred. If CONTRACTOR elects to use a CARRIER advance check to pay for an operating expense, see "Advance Check" row above |
| Performance completion charges – in general, pursuant to Agreement § 17, for CARRIER's cost of completing a shipment or other assignment | Amount CARRIER paid or otherwise incurred pursuant to Agreement § 17. If non-completion is excusable in CARRIER's reasonable judgment, compensation shall be |

| CHARGE-BACK OR DEDUCTION ITEM | AMOUNT, OR METHOD OF COMPUTATION, OF DEDUCTION |
|---|---|
| CONTRACTOR undertakes but does not complete for any reason (including CONTRACTOR's dropping a load at a facility CARRIER operates or utilizes rather than at the consignee's location) | paid to CONTRACTOR for the portion of the trip CONTRACTOR made. |
| Termination-related expenses pursuant to Agreement § 2(c) | Amount CARRIER paid or otherwise incurred |
| Transponder replacement if lost, stolen, or damaged by CONTRACTOR | Amount CARRIER paid to transponder-issuing organization (amounts shown in Section 3 of Appendix A (CONTRACTOR Election Form) |
| Travel cost (bus, air, taxi, or other passenger fares) if CONTRACTOR needs to travel due to an accident or other CARRIER-approved trips | Amount CARRIER paid outside vendor |
| Uniforms if CONTRACTOR elects to order through CARRIER | See Appendix A (CONTRACTOR Election Form), § 3 |
| Weigh station bypass charges if CONTRACTOR elects to use Pre-Pass or other weigh station bypass services | See Appendix A (CONTRACTOR Election Form), § 3 |

**5(b).   Documentation.**   CARRIER shall provide CONTRACTOR a written explanation and itemization and documentation of any deductions for cargo or property damage before making them.  With respect to all charge-backs and deductions, CARRIER shall make available to CONTRACTOR, upon request, copies of those documents necessary to determine the validity of the charge.

**5(c).   Changes in Existing Deduction Items.**  If an item in any of the above columns or in Section 3 of Appendix A (CONTRACTOR Election Form) will be changing, CONTRACTOR shall be so notified by personal delivery, fax, other written notice, or by appropriate electronic means if the parties have both signed Appendix C.   In any event, CONTRACTOR shall not be subject to any such change until fifteen (15) days after such notice or such later time as is set forth in the notice.  CONTRACTOR's failure, by the end of 15-days after such notice, to notify CARRIER of any objection to the change shall constitute CONTRACTOR's express consent and authorization to CARRIER to implement the change and modify accordingly the amount deducted or otherwise recovered from CONTRACTOR pursuant to Subsection (a) above or the table in Section 3 of Appendix A (CONTRACTOR Election Form), beginning immediately after the 15-day period.   Such modified amounts shall replace and supersede those shown in such tables.  If CONTRACTOR fails to notify CARRIER of CONTRACTOR's objection within the 15-day period – or if CONTRACTOR notifies CARRIER of CONTRACTOR's objection within the 15-day period and the parties are then unable to resolve the matter, the parties shall each have the right to terminate this Agreement immediately thereafter.  Once the change becomes effective, CONTRACTOR still retains the right to terminate this Agreement in accordance with the procedures set forth in Section 2 of this Agreement (although CONTRACTOR shall remain subject to the change until the effective date and time of CONTRACTOR's termination).

## 6.   INSURANCE.

**6(a).   Carrier's Insurance Obligations.**  Pursuant to FMCSA regulations (49 C.F.R. Part 387) promulgated under 49 U.S.C. § 13906 and pursuant to applicable state laws, CARRIER shall maintain, at its expense, public liability insurance (personal injury-property damage coverage and environmental restoration coverage), and cargo liability insurance for the Equipment at all times while the Equipment is being operated on behalf of CARRIER.  CARRIER's personal injury/property damage insurance shall have a combined single limit of not less than the amount set forth in Section 5(a) of Appendix A (CONTRACTOR Election Form), with a deductible for personal-injury or property-damage claims no greater than the amount set forth in Section 5(a) of Appendix A (CONTRACTOR Election Form).  CARRIER's personal injury/property damage insurance policy and cargo insurance policy shall list CONTRACTOR, either by class or individually, as an additional insured.  However, CARRIER's possession of such insurance shall in no way affect CARRIER's rights of indemnification against CONTRACTOR as provided for in this Agreement.

**6(b).   Contractor's Insurance Obligations.**  CONTRACTOR shall maintain, at its expense, the following minimum insurance coverages during this Agreement:

**6(b)(1).     Non-Trucking Liability.** CONTRACTOR shall procure, carry, and maintain public liability and property damage insurance which shall provide coverage to CONTRACTOR whenever the Equipment (as well as any CARRIER trailer) is not being operated on behalf of CARRIER (including, but not limited to, whenever the Equipment is being operated on behalf of others pursuant to a Trip Lease or whenever the Equipment is being operated on behalf of CONTRACTOR alone) in a combined single limit of not less than the amount set forth in Section 5(a) of Appendix A (CONTRACTOR Election Form), with a deductible no greater than the amount set forth in Section 5(a) of Appendix A (CONTRACTOR Election Form). Such coverage shall be no less comprehensive than the coverage CARRIER will facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in the "CERTIFICATE OF INSURANCE" in Section 5(b) of Appendix A (CONTRACTOR Election Form). In addition, such coverage shall be primary and non-contributory to any other insurance that may be available from CARRIER. CONTRACTOR shall be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

**6(b)(2).     Workers' Compensation/Occupational Accident Insurance.**

**6(b)(2)(A).     Worker's Compensation Coverage.** CONTRACTOR shall, to the extent required or permitted by law, provide workers' compensation insurance coverage (or, if CONTRACTOR prefers, occupational accident insurance coverage where both state law allows and CARRIER approves) for CONTRACTOR (if a natural person) and those of its drivers, employees, agents, and any other persons required to be principally covered under the worker's compensation law of the State in which CONTRACTOR is domiciled and in amounts not less than the statutory limits required by such State's law. The worker's compensation insurance policy shall provide principal coverage in the State set forth in Section 5(a) of Appendix A (CONTRACTOR Election Form) as well as the State in which CONTRACTOR is domiciled; shall provide "other states coverage" that excludes only the "monopolistic states" – namely,   North Dakota, Ohio, Washington, and Wyoming; and shall provide, if available, Extended Protection to cover CONTRACTOR and CARRIER for any claim or expenses incurred as a result of a claim made by CONTRACTOR, its drivers, employees, agents, and other persons utilized by CONTRACTOR in any of the monopolistic states. If CONTRACTOR is domiciled in any of the four foregoing states, CONTRACTOR shall have state-fund coverage.   As evidence of such coverage, CONTRACTOR shall provide CARRIER with a copy of the insurance policy declarations page for CARRIER's verification before operating the Equipment under this Agreement (or other document issued by the appropriate state fund including, where applicable, current certificates of premium payment).

**6(b)(2)(B).     Occupational Accident Coverage.**   CONTRACTOR may, as an alternative to obtaining workers' compensation coverage, obtain an occupational accident insurance policy that includes either an endorsement or a separate policy provision whereby an admitted insurer provides, or agrees to provide, workers' compensation coverage that becomes effective for a claim by CONTRACTOR alleging employee status, but CONTRACTOR may elect this alternative ONLY IF:

**6(b)(2)(B)(1).     CONTRACTOR either –**

**6(b)(2)(B)(1)(a).     Is the sole owner, and the sole and exclusive operator, of the Equipment, or**

**6(b)(2)(B)(1)(b).     Has workers and the State in which CONTRACTOR is domiciled both exempts CONTRACTOR from maintaining workers' compensation coverage of CONTRACTOR (if a natural person) and CONTRACTOR's employees and protects CARRIER from being considered the employer of either CONTRACTOR or CONTRACTOR's workers;**

**6(b)(2)(B)(2).     The state in which the work is principally localized is not Colorado, Massachusetts, Nevada, New Hampshire, New Jersey, New York, or North Carolina; .**

**6(b)(2)(B)(3).     The occupational accident insurance coverage is no less comprehensive than the coverage CARRIER may facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in the "CERTIFICATE OF INSURANCE" in Section 5(b) of Appendix A (CONTRACTOR Election Form); and**

**6(b)(2)(B)(4).     CARRIER approves the coverage.**

**6(b)(2)(C).**    Certain Kansas, Utah - or Mississippi-Domiciled Contractors.  If domiciled in Kansas, Utah or Mississippi, Contractor must provide evidence of:

>   **6(b)(2)(C)(1).**    Either workers' compensation insurance coverage or occupational accident insurance coverage if Contractor is the sole owner/exclusive driver of the Equipment; or

>   **6(b)(2)(C)(2).**    Workers' compensation insurance coverage if Contractor is not the sole owner/exclusive driver of the Equipment.

**6(b)(3).    Passenger Insurance.**  If Contractor wishes to carry passengers in the Equipment (subject to Carrier so authorizing in advance pursuant to Section 19 of this Agreement), CONTRACTOR shall procure, carry, and maintain passenger liability insurance that shall provide coverage to CONTRACTOR whenever the Equipment is being operated (whether or not on behalf of CARRIER) in a combined single limits, and aggregate limit of liability, of not less than the amounts set forth in Section 5(a) of Appendix A (CONTRACTOR Election Form) .  Such coverage shall be no less comprehensive than the coverage CARRIER may facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in the "CERTIFICATE OF INSURANCE" in Section 5(b) of Appendix A (CONTRACTOR Election Form).  In addition, such coverage shall be primary to any other insurance that may be available from CARRIER.  CONTRACTOR shall be responsible· for all deductible amounts and for any loss or damage in excess of the policy limit.

**6(b)(4).    Other Insurance.**  In addition to the insurance coverages required under this Agreement, it is CONTRACTOR's responsibility to procure, carry, and maintain any fire, theft, uninsured and/or underinsured motorist, physical damage (collision), or other insurance coverage that CONTRACTOR may desire for the Equipment or for CONTRACTOR's health care or other needs.  **As provided in Section 13(a) of this Agreement, CONTRACTOR holds CARRIER harmless with respect to loss of or damage to CONTRACTOR's Equipment, trailer, or other property, and CARRIER has no responsibility to procure, carry, or maintain any insurance covering loss of or damage to CONTRACTOR's Equipment, trailer, or other property.  CONTRACTOR acknowledges that CARRIER may, and CONTRACTOR hereby authorizes CARRIER to, waive, reject, or reduce no-fault, uninsured, and underinsured motorist coverage from CARRIER's insurance policies to the extent allowed under the law of the State set forth in Section 5(a) of Appendix A (CONTRACTOR Election Form) (the State in which CARRIER's insurance policies are delivered), and CONTRACTOR shall cooperate in the completion of all necessary documentation for such waiver, election, rejection, or reduction.**

**6(c).    Requirements Applicable To All Of Contractor's Insurance Coverages.**  CONTRACTOR shall procure insurance policies providing the above-described coverages solely from insurance carriers that are A.M. Best "A"-rated (or of equivalent financial strength in the commercially-reasonable judgment of CARRIER), and CONTRACTOR shall not operate the Equipment under this Agreement unless and until CARRIER has determined that the policies are acceptable (CARRIER's approval shall not be unreasonably withheld).  CONTRACTOR shall furnish to CARRIER written certificates (or in the case of workers' compensation coverage, the insurance policy declarations page) obtained from CONTRACTOR'S insurance carriers showing that all insurance coverages required above have been procured from such above-rated insurance carriers, that the coverages are being properly maintained, and that the premiums thereof are paid.  Each insurance certificate shall specify the name of the insurance carrier, the policy number, and the expiration date; list CARRIER as an additional insured with primary and non-contributory coverage (except that any workers' compensation policy shall contain an alternate employer endorsement in favor of CARRIER); and show that written notice of cancellation or modification of the policy shall be given to CARRIER at least thirty (30) days prior to such cancellation or modification.

**6(d).    Contractor's Liability If Required Coverages Are Not Maintained.  In addition to CONTRACTOR's hold harmless/indemnity obligations to CARRIER under Section 13 of this Agreement, CONTRACTOR agrees to defend, indemnify, and hold CARRIER harmless from any direct, indirect, or consequential loss, damage, fine, expense, including reasonable attorney fees, actions, claim for injury to persons, including death, and damage to property that CARRIER may incur arising out of or in connection with CONTRACTOR'S failure to maintain the insurance coverages required by this Agreement.  In addition, CONTRACTOR, on behalf of its insurer, expressly waives all subrogation rights against CARRIER, and, in the event of a subrogation action brought by CONTRACTOR's insurer, CONTRACTOR agrees to defend, indemnify, and hold CARRIER harmless from such claim.**

**6(e).    Availability Of Insurance Facilitated By Carrier.**  CONTRACTOR may, if it so chooses by initialing one or more boxes in the right-hand column of the "CERTIFICATE OF INSURANCE" in Section 5(b) of Appendix A (CONTRACTOR Election Form), authorize CARRIER to facilitate, on CONTRACTOR'S behalf, certain insurance coverages required or made optional by this Agreement. In any such case, CARRIER shall deduct or otherwise recover

pursuant to Section 5(a) of this Agreement amounts reflecting all of CARRIER's expense and cost in obtaining and administering such coverage.  In addition, if CONTRACTOR fails to provide proper evidence of the purchase or maintenance of the insurance required above, then CARRIER is authorized but not required to obtain such insurance at CONTRACTOR's expense and deduct or otherwise recover pursuant to Section 5(a) of this Agreement amounts reflecting all of CARRIER's expense in obtaining and administering such coverage.  CONTRACTOR recognizes that CARRIER is not in the business of selling insurance, and any insurance coverage requested by CONTRACTOR from CARRIER is subject to all of the terms, conditions, and exclusions of the actual policy issued by the insurance underwriter.  CARRIER shall ensure that CONTRACTOR is provided with a certificate of insurance (as required by 49 C.F.R. § 376.12(j)(2)) for each insurance policy under which the CONTRACTOR has authorized CARRIER to facilitate insurance coverage from the insurance underwriter (each such certificate to include the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to CONTRACTOR for each type of coverage, and the deductible amount for each type of coverage for which CONTRACTOR may be liable), and CARRIER shall provide CONTRACTOR with a copy of each policy upon request.

6(f). **Changes In Cost Or Other Details Of Coverages.**  If CARRIER is facilitating any insurance coverages for CONTRACTOR pursuant to Subsection (e) above and the cost to CONTRACTOR for, or other details of, a coverage changes from the information listed in the "CERTIFICATE OF INSURANCE" in Section 5(b) of Appendix A (CONTRACTOR Election Form) or in Section 5(a) of this Agreement and Section 3 of Appendix A (CONTRACTOR Election Form), CONTRACTOR shall be so notified by personal delivery, fax, other written notice, or, if the parties have both signed Appendix C, by the electronic means outlined in that appendix.  In any event, CONTRACTOR shall not be subject to any such change until fifteen (15) days after such notice or such later time as is set forth in the notice. CONTRACTOR's failure, by the end of fifteen (15) days after such notice, to notify CARRIER of any objection to the change shall constitute CONTRACTOR's express consent and authorization to CARRIER to implement the change and modify accordingly the deductions from CONTRACTOR's settlement compensation, beginning immediately after the 15-day period.  Such modified amounts shall replace and supersede those shown in Section 5(a) of this Agreement or Section 3 of Appendix A (CONTRACTOR Election Form).  CARRIER shall thereupon provide CONTRACTOR with a revised Certificate of Insurance, required by Subsection (e) above, reflecting the change (such certificate to include the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to CONTRACTOR for each type of coverage, and the deductible amount for each type of coverage for which CONTRACTOR may be liable) and, upon request, a copy of the corresponding insurance policy. If CONTRACTOR fails to notify CARRIER of any objection within the 15-day period -- or if CONTRACTOR notifies CARRIER of its objection within the 15-day period and CONTRACTOR and CARRIER are then unable to resolve the matter to their mutual satisfaction -- CONTRACTOR and CARRIER shall each have the right to terminate this Agreement effective immediately upon the change becoming effective (although CONTRACTOR shall remain subject to the change until CONTRACTOR's termination's effective date and time).

7. **ESCROW FUND.**    CONTRACTOR authorizes CARRIER, and CARRIER agrees, to establish and administer an escrow fund (referred to throughout this Agreement as "Escrow Fund") to be governed by the following terms and conditions:

7(a).    **Principal.**  The amount of principal to be held in the Escrow Fund shall be a minimum of the Principal Amount set forth on the "Escrow Fund contributions" row of the table in Section 3 of Appendix A (CONTRACTOR Election Form). CARRIER shall make deductions from CONTRACTOR's compensation at the rate set forth on that same row and deposit these amounts in the Escrow Fund, beginning the first week of services provided by CONTRACTOR under this Agreement.  If, at any time, the principal amount in escrow falls below the above Principal Amount, CONTRACTOR authorizes CARRIER to deduct from CONTRACTOR's compensation at double the indicated rate until the minimum principal amount is replenished.

7(b).    **Specific Items To Which Escrow Fund May Be Applied.**  The Escrow Fund shall be held by CARRIER for the purpose of insuring compliance with the provisions of this Agreement.  The specific items to which the Escrow Fund shall apply are all charge-back and deduction items set forth in the table in Section 5(a) of this Agreement, and appendixes to, this Agreement (hereafter "Escrow Items"), to the extent the amounts owed by CONTRACTOR for such Escrow Items exceed CONTRACTOR's earned and payable compensation at the time of any settlement or final accounting.

7(c).    **Accountings.**  While the Escrow Fund is under CARRIER's control, CARRIER shall provide an accounting to CONTRACTOR, no less frequently than monthly, of all transactions involving the Escrow Fund by clearly indicating on individual settlement sheets the amount and description of any deduction or addition made to the Escrow Fund.   In addition, upon CONTRACTOR's request, CARRIER shall provide CONTRACTOR with an accounting of any transactions involving CONTRACTOR's Escrow Fund.

7(d).    **Interest.**  CARRIER shall pay interest to CONTRACTOR on the Escrow Fund, as consolidated with the escrow funds under any other independent contractor operating agreements between CONTRACTOR and CARRIER covering

other units of tractor equipment, on at least a quarterly basis ("interest period") beginning with receipt of the first CONTRACTOR contribution of principal. The interest rate shall be established on the date the interest period begins and shall be equal to the average yield of 91-day, 13-week U.S. Treasury bills, as established in the weekly auction by the Department of Treasury, or such higher rate as may be set forth on the "Escrow Fund" row in the table in Section 3 of Appendix A (CONTRACTOR Election Form).

**7(e).** **Final Settlement.** At the time of the return of any remaining balance in the Escrow Fund, under this Agreement, CARRIER may deduct monies for all Escrow items first from the Escrow Fund under this Agreement. Such deductions shall be limited to amounts CARRIER actually spends, incurs, or owes to a third party, or that CONTRACTOR owes to CARRIER or a third party under a purchase or rental contract, before termination of this Agreement or, with respect to any CONTRACTOR obligation triggered by termination, including any expenses (including reasonable attorneys' fees) incurred by CARRIER in seeking the return of its identification devices and other property, all amounts CARRIER actually spends, incurs, or owes to a third party upon termination or within forty-five (45) days thereafter. CARRIER shall not make deductions from the Escrow Fund for items for which, by the end of forty-five (45) days after termination, neither CONTRACTOR nor CARRIER has yet made expenditure or incurred a quantified, legally binding obligation to pay. CARRIER shall provide a final accounting to CONTRACTOR of all such final deductions made from the Escrow Fund within forty-five (45) days from the date of termination of this Agreement.

**7(f).** **Return of Escrow Balance.** In no event shall the Escrow Fund, under this Agreement alone, less any final deductions pursuant to the above provision, be returned to CONTRACTOR later than forty-five (45) days from the date of termination of this Agreement. CARRIER's use, or post-termination return to CONTRACTOR, of any balance in the Escrow Fund, under this Agreement alone, shall not constitute a waiver of CARRIER's right to recover, through collection agencies, litigation, arbitration, the right of offset, and all other available legal means, any additional amounts CONTRACTOR owes, or comes to owe, CARRIER under this Agreement.

**8.** **COMPLIANCE WITH LEGAL AND CUSTOMER REQUIREMENTS.** Neither CONTRACTOR nor CARRIER shall engage in, or attempt, conspire, or threaten to engage in, any act or omission that would constitute a felony or intentional tort, whether or not relating to or arising out of operations under this Agreement. In addition, CONTRACTOR recognizes that CARRIER's separate and distinct business of providing motor carrier freight transportation service to the public is subject to the requirements of CARRIER's customers and to regulation by the federal government acting through DOT, and by various other federal, state, local, and foreign authorities.[1] CONTRACTOR hereby acknowledges that he/she possesses full and complete understanding and knowledge of the applicable requirements of all such authorities, including but not limited to DOT (including FMCSA's CSA Program), state, provincial, or local highway safety, vehicle inspection, vehicle maintenance, traffic, road, truck size-and-weight, hazardous materials transportation, cargo security, or other laws and regulations ("Applicable Law"), and of all customer requirements provided to CONTRACTOR in writing. CONTRACTOR shall adhere to the following provisions of this Agreement to aid CARRIER in discharging its legal and customer-service responsibilities:

**8(a).** **Drivers.**

**8(a)(1).** In General. CONTRACTOR shall provide competent professional drivers who meet CARRIER's minimum driver qualification standards (part of CARRIER Policies and Procedures[1]) and all Applicable Law. As part of the driver qualification process, CONTRACTOR and CONTRACTOR's drivers shall authorize CARRIER to access applicable driver files, Driver Safety Measurement System ("DSMS") safety scores, and any other driver data or information available as part of FMCSA's CSA Driver Information Resource System ("DIRS"). CARRIER

---

[1] CARRIER Policies and Procedures" comprise the *Cowan Systems, LLC Contractor Manual*, CARRIER's then-current edition of P.C. Miler computerized mileage guide, and the Federal Motor Carrier Safety Regulations (see "Rules & Regulations" at www.fmcsa.dot.gov). CARRIER shall furnish a paper copy of the *Contractor Manual* to CONTRACTOR, at no charge, contemporaneously with the start of this Agreement and, during this Agreement, shall make the *Manual* available to CONTRACTOR on request for inspection at a CARRIER terminal during normal business hours at no charge. CARRIER shall furnish a paper copy of any amendments to the *Contractor Manual* to CONTRACTOR, at no charge, before the amendments go into effect. CONTRACTOR may, at CONTRACTOR's expense, inspect, download, and/or print the Federal Motor Carrier Safety Administration Regulations by accessing (including, on request, at any CARRIER terminal) the Federal Motor Carrier Safety Administration's "Rules & Regulations" web page indicated above. With respect to P.C. Miler, a third-party copyrighted mileage guide, CARRIER shall furnish to CONTRACTOR upon request and at no charge at any CARRIER terminal during normal business hours, prints of a commercially-reasonable number of particular CONTRACTOR-requested city-to-city mileage calculations.

shall have the right to disqualify any driver provided by CONTRACTOR if the driver is found to be unsafe, unqualified, unfit, uninsurable, or marginal, pursuant to federal or state law or the criteria established by the FMCSA's CSA DIRS, in violation of CARRIER's minimum qualification standards, or in violation of any policies of CARRIER's customers. Drivers with a recent history of accidents, traffic convictions and/or serious traffic offenses will not meet CARRIER's minimum qualification standards. Upon a driver's disqualification by CARRIER, CONTRACTOR shall be obligated to furnish another competent, reliable and qualified professional driver that meets the minimum qualification standards established by CARRIER. If CONTRACTOR is a driver, CONTRACTOR shall be free to hire a substitute driver or drivers at any time, who, upon being declared qualified by CARRIER under the foregoing driver requirements, may begin operating under CONTRACTOR's direction and control in performing some or all of CONTRACTOR's obligations under this Agreement. For all qualified drivers, CONTRACTOR agrees to provide CARRIER with updated DSMS and DIRS driver rankings on a monthly basis.

8(a)(2).   **TWIC Requirement.**  CONTRACTOR shall ensure that each of its drivers obtains a Transportation Worker Identification Credential ("TWIC") from the Transportation Security Administration of the U.S. Department of Homeland Security. If a CONTRACTOR's driver lacks a TWIC when dispatched by CARRIER to make a pickup or delivery at a port and therefore needs a suitably-credentialed escort, CONTRACTOR shall pay the fee charged by the escort.

8(b).   **Paperwork Requirements.**  CONTRACTOR shall submit to CARRIER, on a timely basis, all driver logs and supporting documents (including originals or photocopies of toll receipts), physical examination certificates, accident reports, and any other required data, documents or reports, including any documentary evidence that CARRIER requests proving CONTRACTOR has paid all taxes legally due and owing to any government body. As required by 49 C.F.R. § 376.12(i), CARRIER will keep the original of this Agreement with a copy to be maintained by CONTRACTOR, and a second copy to be carried in the Equipment during the term of this Agreement.

8(c).   **Shipping Documents.**  CONTRACTOR agrees that all bills of lading, waybills, freight bills, manifests, or other papers identifying the property carried on the Equipment shall be those of CARRIER, those of a Sublease Carrier to which the Equipment has been subcontracted, or as otherwise authorized by CARRIER, and shall indicate that the property transported is under the responsibility of CARRIER or a Sublease Carrier.

8(d).   **Medical Examinations.**  CONTRACTOR acknowledges that DOT requires all drivers to undergo a complete medical examination prior to being allowed to drive, in any capacity whatsoever, in CARRIER's motor carrier services. Such examination shall be performed and shall include testing for use of controlled substances and alcohol. Drivers may be required to take follow-up examinations, from time to time, in accordance with the requirements of 49 C.F.R. §§ 391.41 *et seq.* Additionally, if in the judgment of CARRIER a further medical examination appears warranted, such examination shall be undergone. CONTRACTOR shall bear the expense of medical examinations for all of CONTRACTOR's drivers.

8(e).   **Drug and Alcohol Testing.**  CONTRACTOR and its drivers shall, as required by 49 C.F.R. §§ 382.103 and 382.601, comply with CARRIER's Drug and Alcohol Policy, including participation in CARRIER's random drug and alcohol testing program, and any addendums or revisions thereto. Violation of CARRIER's Drug and Alcohol Policy, or positive tests for prohibited drugs or alcohol, shall immediately disqualify CONTRACTOR's driver. CARRIER shall bear the expense of all drug and alcohol tests.

8(f).   **Safe and Legal Operations.**  CONTRACTOR shall ensure that it and all of its drivers or other personnel (A) drive or otherwise perform in a safe and prudent manner at all times so as to avoid endangering the public, the driver, and/or the property being transported; (B) adhere to and perform the terms of this Agreement, the requirements of all Applicable Law, CARRIER's operating authorities, and, conditioned only upon Point (A) of this Subsection, all CARRIER Policies and Procedures; and (C) do not, in CARRIER's reasonable judgment, in whole or in part cause, through negligence, gross negligence, or willful misconduct, an "accident," as that term is defined by FMCSA in 49 C.F.R. § 390.5.

8(g).   **CSA Compliance.**  Beginning on the date FMCSA makes its Compliance Safety Accountability ("CSA") Program effective as to CARRIER's and CONTRACTOR's operations under this Agreement, CONTRACTOR, and any drivers of CONTRACTOR, shall at all times meet CSA safety standards sufficient to enable CARRIER to (a) achieve and maintain a "fit" or similar rating that enables CARRIER to operate without FMCSA intervention or restriction pertaining to any of the seven safety evaluation areas measured by CSA ("BASICs"); (b) obtain insurance coverage without increased costs associated with driver ratings or other such driver measurements or qualifications pertaining to drivers under CSA; and (c) be and remain competitive with similarly situated carriers with regard to quality of driver safety as measured under CSA. CONTRACTOR further agrees to notify CARRIER in writing within two (2) business days of receiving notification from the FMCSA that CONTRACTOR or any of its drivers have been deemed "unfit" or "marginal" based on their safety, inspection, and compliance performance

8(h).   **Customer Requirements.**  CONTRACTOR shall adhere to and perform, with respect to each shipment offered by CARRIER under this Agreement, all service standards and other requirements of CARRIER's customers that have been furnished to CONTRACTOR in writing, in hard-copy or electronic form, in advance of the shipment.

9.   **CONTRACTOR'S OPERATING EXPENSES.**

9(a).   **Operating Expenses – In General.**  CONTRACTOR shall, at its expense, provide all the Equipment ready to operate and fully roadworthy, including the necessary licenses, permits, cab cards, state base plates and shall furnish all necessary lubricants, fuel, tires (including changing or repairing tires), and other parts, supplies, equipment, and repairs necessary or required for the safe and efficient operation and maintenance of the Equipment, including repairs for the operation of such Equipment.  CONTRACTOR shall pay all expenses incident to the operation of the Equipment, including, but not limited to, empty mileage, lumper expenses, highway use taxes, weight taxes, state property or indefinite situs taxes, fuel taxes, registration fees, base plates, and licenses (and any unused portions of such fees, plates, or licenses), permits of all types, ferry, bridge, tunnel, and road tolls, detention and accessorial charges not collected by CARRIER because of CONTRACTOR's failure to provide the required documentation, and wages and other remuneration of drivers, drivers' helpers, and other personnel engaged by CONTRACTOR, worker's compensation insurance (or, if CONTRACTOR prefers, occupational accident insurance where both state law allows and CARRIER approves), unemployment insurance, payroll taxes, and employee benefits for such personnel.

9(b).   **Maintenance and Inspection.**  CONTRACTOR, at its expense, shall equip and maintain the Equipment in safe condition and in complete compliance with all laws and regulations of the states in which CONTRACTOR operates and the DOT.  In order to ensure compliance with all DOT regulations, CONTRACTOR shall, at its expense, at the start of this Agreement, make the Equipment available for a full DOT inspection pursuant to 49 C.F.R. § 396.17 at a maintenance facility operated or approved by CARRIER, and shall have any necessary maintenance or repairs done at CONTRACTOR's expense. During this Agreement, CONTRACTOR shall, at CONTRACTOR's expense, have a full DOT inspection performed once every one hundred eighty (180) days and/or at such other intervals required by law at a maintenance facility operated or approved by CARRIER.  CONTRACTOR shall also make the Equipment available for inspection by CARRIER at any time upon reasonable request by CARRIER.  CONTRACTOR shall provide CARRIER with a copy of all inspection reports upon completion of the inspection and shall, as directed by CARRIER, promptly forward to CARRIER all other inspection, maintenance and repair records for the Equipment.

9(c).   **Fines and Penalties.**  Except as otherwise provided in Subsection (d) of this Section, CONTRACTOR agrees to pay all fines and penalties arising out of use of the Equipment under this Agreement, including but not limited to parking and traffic fines and penalties, imposed for violation of any law or regulation by the state, province, or locality in which CONTRACTOR operates, or by DOT, where such violation results, at least partially, from the acts or omissions of CONTRACTOR.

9(d).   **Overweight and Oversized Shipments.**  CONTRACTOR shall have the duty to determine that all shipments are in compliance with the size and weight laws of the states, provinces, and localities in which or through which the Equipment will travel and to notify CARRIER if the vehicle is overweight, oversized, or in need of permits before commencing the haul.  Except when the violation results from the acts or omissions of CONTRACTOR, CARRIER shall assume the risks and costs of fines for overweight and oversize trailers when such trailers are preloaded and sealed, or the load is containerized, or for improperly permitted oversized and overweight loads, or the trailer or lading is otherwise outside of CONTRACTOR's control.  CONTRACTOR shall pay, or reimburse CARRIER, for any costs or penalties due to CONTRACTOR's failure to weigh each shipment or to notify CARRIER that the vehicle is overweight, oversized or in need of permits.

9(e).   **License Base Plates and Permits.**

9(e)(1).   **Base Plates.**  CONTRACTOR shall obtain, and properly display on the Equipment, the license base plates necessary to operate the Equipment lawfully on CARRIER's behalf.  If CONTRACTOR chooses to have CARRIER obtain the base plates and deduct the expense from CONTRACTOR's settlement compensation (with an administrative fee to CARRIER), CONTRACTOR shall so indicate by initialing **Option 2** of Section 2(a) of Appendix A (CONTRACTOR Election Form).  Otherwise, CONTRACTOR shall initial **Option 1** of Section 2(a) of Appendix A.

9(e)(2).   **Permits.**  CONTRACTOR shall ensure that all permits and licenses necessary for him/her to operate the Equipment lawfully on CARRIER's behalf have been obtained, at CONTRACTOR's expense, as detailed in Section 2(b) of Appendix A (CONTRACTOR Election Form).

9(f).   **Fuel and Mileage Tax Reporting.**  If CONTRACTOR elects, by initialing **Option 1** in Section 2(b) of Appendix A (CONTRACTOR Election Form), to obtain CONTRACTOR's own IFTA Fuel Tax Permit CONTRACTOR and perform

CONTRACTOR's own fuel and mileage tax reporting, CONTRACTOR shall be solely responsible for calculating, reporting, and paying all fuel taxes owed for the operation of the Equipment; and shall indemnify, defend, and hold Carrier harmless against all claims arising out of or relating to such fuel tax reporting and payment, and the indemnity limits of Section 13(b) shall not apply. If CONTRACTOR instead elects, by initialing Option 2 in Section 2(b) of Appendix A, to have CARRIER perform (directly or through an outside vendor) all fuel and mileage reporting on CONTRACTOR's behalf, CONTRACTOR hereby agrees that:

9(f)(1).     To facilitate the parties' compliance with the various states' tax reporting and payment laws (which generally hold the motor carrier liable if an independent vehicle operator performing transportation services on the carrier's behalf fails to make the required tax payments), CARRIER shall be deemed the reporting entity with respect to the Equipment and the fuel consumed by the Equipment. In such event, CARRIER shall settle with CONTRACTOR monthly and submit quarterly, in CONTRACTOR's name as indicated herein, as to all the applicable reports and payments of fuel taxes required of it by the taxing bodies and authorities of the appropriate states, provinces, and other governmental bodies with respect to the Equipment operated under this Agreement. To assist in Carrier's computing and payment of fuel taxes, it shall issue CONTRACTOR a limited-purpose credit card issued by a third-party financial-services company and made available by CARRIER ("CARRIER Advance Card") that CONTRACTOR may use for fuel purchases. CONTRACTOR and CONTRACTOR's drivers are free not to use CARRIER's Advance Card but, to the extent they choose not to, CONTRACTOR shall provide CARRIER promptly with all properly completed driver logs, original fuel receipts (each to be submitted with the corresponding log indicating the fuel purchase for which the receipt was obtained), original toll receipts, and an accurate accounting of all fuel purchases and miles traveled by state.

9(f)(2).     CARRIER shall (A) deduct or otherwise recover pursuant to Section 5(a) of this Agreement quarterly any net fuel use tax owed at that time with respect to CONTRACTOR's operations in all taxing jurisdictions combined, along with a quarterly flat charge, set forth in Section 2(b) of Appendix A, covering the permit fee and CARRIER's tax reporting administrative fee, but not any additional fuel tax that CONTRACTOR may owe, or (B) credit quarterly to CONTRACTOR's next settlement any net fuel use tax credit or refund due CONTRACTOR at that time with respect to CONTRACTOR's operations in all taxing jurisdictions combined.   CARRIER shall ensure that CONTRACTOR receives at least quarterly, summaries of credits and debits for fuel taxes on a state-by-state basis either on CONTRACTOR's Settlement Statements or through separate accountings, at CARRIER's option.

9(f)(3).     Ordinarily CARRIER shall compute CONTRACTOR's fuel use and mileage taxes on a fleetwide average basis.  If, however, CONTRACTOR fails to provide CARRIER complete and accurate fuel-tax-related records, as required by the second sentence of Section 9(f)(1) of this Agreement, in time for CARRIER's computation, on the seventh (7th) day of each month, of CARRIER's fuel and mileage tax reports and payments for the preceding month, CARRIER shall compute CONTRACTOR's fuel use taxes based on total miles dispatched by CARRIER at a five (5) miles-per-gallon rate.

9(g).   Communications Equipment.

9(g)(1).     Mobile Telephone.  For safety and customer-service purposes, CONTRACTOR shall obtain, maintain in a fully-functioning condition, and carry at all times while operating the Equipment in CARRIER's service -- and ensure that all of CONTRACTOR's drivers do the same -- a wireless mobile telephone and maintain a corresponding contract for nationwide wireless telephone service, all at CONTRACTOR's expense, and shall supply to CARRIER in the signature block of this Agreement the telephone number(s) by which to reach such mobile telephone. CONTRACTOR shall furnish CARRIER a list of the mobile phone numbers of all of CONTRACTOR's drivers, and immediately update the list in a written notification to CARRIER whenever such drivers or numbers change.

9(g)(2).     Electronic Onboard Recorder. To help enable CARRIER to document its compliance with FMCSA hours-of-service regulations with respect to drivers of the Equipment:

9(g)(2)(A).     Installation and Use of CARRIER-Furnished Recorder.   CARRIER shall, at CARRIER's expense, furnish, install, and maintain in an operable condition in each unit of Equipment, an electronic onboard recorder of the type described in Section 4(e) of Appendix A (CONTRACTOR Election Form). CARRIER shall pay all usage charges in connection with the onboard recorder.

9(g)(2)(B).     Repair and Return of CARRIER-Furnished Recorder. CONTRACTOR shall be responsible for preserving and, immediately upon any request from CARRIER or the termination of this Agreement (in accordance with Section 2 of this Agreement), returning each CARRIER-furnished electronic onboard recorder to CARRIER. A qualified technician selected by CARRIER shall remove the recorder. If during this Agreement or upon its termination, the recorder is lost, damaged as a result of CONTRACTOR's

negligence, or not returned upon request or upon termination of this Agreement, CONTRACTOR hereby authorizes CARRIER to deduct or otherwise recover pursuant to Section 5(a) of this Agreement the entire expense incurred by CARRIER in repairing or replacing the recorder, together with all collection costs. CARRIER shall not be responsible for any loss or damage to CONTRACTOR's Equipment arising or resulting from the installation, use, or removal of the CARRIER-furnished recorder.

**9(g)(3).   Communications Tracking Equipment.** To serve CARRIER's Customers' demands and help fulfill government highway safety requirements, CONTRACTOR shall obtain, install, and maintain in an operable condition in each unit of Equipment, at CONTRACTOR's expense, a satellite or other communications tracking system as follows:

**9(g)(3)(A).**   Furnishing of Communications Equipment. CONTRACTOR is free to, at CONTRACTOR's expense, obtain, install, install in the Equipment, and maintain a communications tracking system that is technically and functionally compatible with the system utilized by CARRIER, as specified in Section 4(a) of Appendix A (CONTRACTOR Election Form), by initialing **OPTION 1** in Section 4(b) of Appendix A. In the alternative, CONTRACTOR may elect, by initialing **OPTION 2** in such Section of Appendix A, to have CARRIER arrange to have installed, in the Equipment, the communications tracking system utilized by CARRIER. In the latter event, CARRIER shall provide such system at no cost to CONTRACTOR. CONTRACTOR agrees to keep the CARRIER-furnished communications system, which shall remain CARRIER's property, in an operable and functioning condition at all times that the Equipment is being operated in CARRIER's service.

**9(g)(3)(B).**   Messaging Usage Charge. Whether CONTRACTOR elects to use his/her own compatible communications and tracking system to communicate with CARRIER or elects instead to have CARRIER arrange for the installation of a system in the Equipment, CARRIER shall deduct or otherwise recover pursuant to Section 5(a) of this Agreement a messaging usage charge in the amount indicated in Section 3 of Appendix A.

**9(g)(3)(C).**   Re-Installation of CARRIER-Furnished System. If CONTRACTOR shall replace the unit(s) of Equipment (tractor(s)), CONTRACTOR shall bear the expense of removal and re-installation of any CARRIER-furnished communications and tracking system in his/her replacement Equipment and hereby authorizes CARRIER to deduct or otherwise recover pursuant to Section 5(a) of this Agreement all such expense.

**9(g)(3)(D).**   Return of Carrier-Furnished System. CONTRACTOR shall be responsible for the return of each CARRIER-furnished communications and tracking system to CARRIER immediately upon any request from CARRIER or the termination of this Agreement, in accordance with Section 2 of this Agreement. A qualified technician selected by CARRIER shall remove the system. If the system is lost, damaged as a result of CONTRACTOR's negligence, or not returned upon request or upon termination of this Agreement, CONTRACTOR hereby authorizes CARRIER to deduct or otherwise recover pursuant to Section 5(a) of this Agreement the entire expense incurred by CARRIER in repairing or replacing the system, together with all collection costs. CARRIER shall not be responsible for any loss or damage to CONTRACTOR's Equipment arising or resulting from the installation, use, or removal of the CARRIER-furnished communications and tracking system.

**9(g)(4).   Use of Communications Equipment.** CONTRACTOR shall ensure that CONTRACTOR's drivers do not operate the voice, data, texting, or other features of any mobile phone or other communications device or system while driving, except in a health, safety, or security emergency.

**10. CARGO CLAIMS.** CONTRACTOR shall immediately report all cargo claims, including all shortages, overages, or other exceptions to the cargo, to CARRIER. **CONTRACTOR's indemnity obligation to CARRIER under Sections 13(a) and (b) of this Agreement shall apply to each cargo claim, including but not limited to, delay, shortages, misdelivery, and any direct damage claim relating to lost, damaged or contaminated loads, arising out of, or in connection with CONTRACTOR's services.**

**11. USE OF CARRIER'S TRAILER.** For every trailer, chassis, or other trailing equipment provided by CARRIER for CONTRACTOR's use ("CARRIER's Trailer"), the following provisions apply:

**11(a).   CARRIER's Responsibilities.** CARRIER shall be responsible for all expenses relating to regular maintenance of axles, brakes, and other electrical and mechanical systems, repairs of damage to the trailer attributable to reasonable wear and tear, and purchases of replacement tires, provided that all such expenses are approved by CARRIER before the work is performed.

**11(b).  CONTRACTOR's Responsibilities While Using CARRIER's Trailer.**  CONTRACTOR shall be responsible for daily pre-trip and post-trip inspections; proper inflation of tires; prompt informing of CARRIER upon experiencing defective or mal-performing tires, brakes, or other electrical or mechanical features of CARRIER's Trailer; and, at CONTRACTOR's expense, proper lubrication and all repairs of all damage to the trailer other than ordinary wear and tear, and CONTRACTOR hereby authorizes CARRIER to deduct or otherwise recover all such amounts pursuant to Section 5(a) of this Agreement.  All trailer repairs and maintenance shall be performed at facilities designated or approved by CARRIER.

**11(c).  CONTRACTOR's Return of CARRIER's Trailer.**  CONTRACTOR agrees to return any CARRIER's Trailer in the same good condition as received by CONTRACTOR, reasonable wear and tear excepted, along with any and all other equipment and property belonging to CARRIER immediately upon CARRIER's request or upon termination of this Agreement.  If the trailer is not in as good as condition (reasonable wear and tear excepted) as when it was delivered by CARRIER, CONTRACTOR hereby authorizes CARRIER to restore the trailer to proper condition and to charge back to CONTRACTOR the costs of such repairs or reconditioning.  If CONTRACTOR for any reason fails to comply with this provision and return CARRIER's trailer, CONTRACTOR agrees to reimburse CARRIER for all reasonable expense, including attorney fees, incurred by CARRIER in recovery of its trailer or property.  CONTRACTOR agrees that if it is necessary for CARRIER to enter upon CONTRACTOR's private property or remove CONTRACTOR's private property in order to recover its trailer and property, CONTRACTOR does hereby irrevocably grant CARRIER or its duly authorized agents, permission to do so and **further agrees to indemnify and hold harmless CARRIER, and its duly authorized agents, from any form of liability whatsoever in connection with such repossession**.  CONTRACTOR shall be liable for, and pay, the entire amount for each incident involving damage, including but not limited to, towing charges, replacement costs for a total loss, arising out of, or in connection with, CONTRACTOR's use of CARRIER's Trailers, CARRIER's customer's trailers, other CARRIER equipment, or equipment of any other carrier. Before deducting any such damage from CONTRACTOR's compensation, CARRIER shall provide CONTRACTOR with a written explanation and itemization of such deduction. CONTRACTOR agrees and warrants that any trailer provided for use by CARRIER will be used by CONTRACTOR and its drivers to transport only shipments tendered to CONTRACTOR by CARRIER, except pursuant to a Trailer Sublease Addendum entered into by CARRIER and CONTRACTOR.

**12.  CRASHES, ACCIDENTS, INCIDENTS, AND CLAIMS.**  CONTRACTOR shall immediately report to CARRIER any crash, accident, incident, or potential claim involving operations under this Agreement.  CONTRACTOR and its drivers shall cooperate fully with CARRIER with respect to any legal action, regulatory hearing or other similar proceeding arising from the operation of the Equipment, the relationship created by this Agreement or the services performed hereunder. CONTRACTOR shall, upon CARRIER's request and at CONTRACTOR's sole expense, provide written reports or affidavits, attend hearings and trials and assist in securing evidence or obtaining the attendance of witnesses.  CONTRACTOR shall provide CARRIER with any assistance as may be necessary for CARRIER or CARRIER's representatives or insurers to investigate, settle or litigate any crash, accident, incident, claim, or potential claim by or against CARRIER.

**13.  INDEMNIFICATION AND HOLD HARMLESS.**

**13(a).  In General.  Except to the extent CONTRACTOR's acts or omissions are covered under the parties' respective insurance policies as set forth in Section 6 of this Certificate and the Certificate of Insurance in Section 5(b) of Appendix A (CONTRACTOR Election Form) with no expense to CARRIER, CONTRACTOR agrees to defend, indemnify and hold harmless CARRIER from any loss, damage, delay, fine, civil penalty, including reasonable attorney's fees and costs of litigation, action, claim for injury to persons, including death, damage to property, cargo loss or damage, damage to CARRIER's Trailer, or other expense that CARRIER pays or otherwise incurs arising out of or in connection with CONTRACTOR's (including its agents' or employees') negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions.  CONTRACTOR hereby authorizes CARRIER to deduct or otherwise recover pursuant to Section 5(a) of this Agreement any amounts due CARRIER under this Section 13.  CARRIER shall furnish CONTRACTOR with a written explanation and itemization of any deduction for cargo or property damage before the deduction is made.  If CONTRACTOR operates the Equipment for any purpose other than the carriage of CARRIER's lading, CONTRACTOR shall hold CARRIER harmless and indemnify CARRIER for any damage (including attorneys' fees) arising from such use.  This Section shall remain in full force and effect both during and after the termination of this Agreement.**

**13(b).  Indemnity Limits.**  With respect to any claim of Damages under Subsection (a) of this Section, CONTRACTOR's indemnity obligation under Subsection (a) of this Section shall be limited to paying CARRIER the following amounts of the total amount CARRIER paid or otherwise incurred per occurrence: 1) up to $2,500 for cargo loss or damage, 2) up to $2,500 for trailer damage, and 3) up to $2,500 for liability to third parties for property damage and/or personal injury. These dollar limits shall not apply to Damages arising out of or in

connection with such claims if involving CONTRACTOR's (including CONTRACTOR's agents' or employees') gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions.

13(c). CARRIER's Coverages. CARRIER has secured certain insurance policies and coverages directly relevant to certain risks and liabilities for which CONTRACTOR has agreed to indemnify CARRIER under this Section (for example, automobile liability, general liability, and cargo liability arising out of or in connection with CONTRACTOR's (including its agents' or employees') negligence, gross negligence, willful misconduct, or other culpable acts or omissions). Such policies are expressly for the benefit of CARRIER and incidentally may benefit CONTRACTOR. Terms of such policies may change (for example, higher or lower deductibles, length of coverage, LIMLIM waivers or limitations, or insurance underwriters). CONTRACTOR has neither any obligations under the policies nor any right to change the terms of coverages.

13(d). Claims by CONTRACTOR or Other Contractors. Notwithstanding Subsection (a) of this Section and not subject to the limits of Subsection (b) of this Section, CONTRACTOR agrees to defend, indemnify, and hold CARRIER harmless from any claim by CONTRACTOR of personal injury (including death) to CONTRACTOR or loss of or damage to CONTRACTOR's Equipment or other property (and any related fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation) due to the negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions of CONTRACTOR or any other contractor of CARRIER (including agents or employees of CONTRACTOR or any other contractor of CARRIER, respectively) and from any claim by any other contractor of CARRIER of personal injury (including death) to such other contractor or loss of or damage to such other contractor's truck, tractor, trailer, or other property (and any related fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation) due to the negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions of CONTRACTOR (including CONTRACTOR's agents or employees).

13(e). Reclassification. SECTION 16 AND OTHER PROVISIONS OF THIS AGREEMENT REFLECT THAT CONTRACTOR IS, AND BOTH CONTRACTOR AND CARRIER INTEND CONTRACTOR TO BE, AN INDEPENDENT CONTRACTOR, NOT AN EMPLOYEE OF CARRIER. IN LIGHT OF THIS FACT AND INTENT: Notwithstanding Subsection (a) of this Section and not subject to the limits of Subsection (b) of this Section, CONTRACTOR agrees to indemnify and hold CARRIER harmless from all reasonable attorney's fees and litigation expenses CARRIER incurs in defending against any claims, suits, actions, administrative proceedings, or arbitrations brought by CONTRACTOR, CONTRACTOR's owner (if any), or any employees or other personnel engaged by CONTRACTOR to perform services under this Agreement – or, at CONTRACTOR's instance or with CONTRACTOR's consent, by any union or other private organization or member of the public – that allege that CONTRACTOR or any of CONTRACTOR's workers is an employee of CARRIER, but fail to result in any final (upon completion of all appeals or the running of all applicable appeal periods) judicial or administrative decision or arbitration award holding such allegation to be true.

14. INDEMNIFICATION BY CARRIER.

14(a). CARRIER agrees to defend, indemnify, and hold CONTRACTOR harmless from any claim (including any for which CONTRACTOR is not indemnified by CARRIER's insurance) of direct, indirect, or consequential loss, damage, delay, fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation (together "Damages") that CONTRACTOR pays or otherwise incurs arising out of or in connection with CARRIER's (including CARRIER's agents' or employees') negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions. This indemnification shall not apply to any claim of loss or damage to the Equipment or to CONTRACTOR's other property or to any claim arising out of or in connection with CONTRACTOR's operation of the Equipment for any purpose other than the performance of CONTRACTOR's obligations under this Agreement. CONTRACTOR shall furnish CARRIER with a written explanation and itemization of any claim for cargo or property damage.

14(b). CARRIER's indemnity obligation under Subsection (a) above shall, if involving CARRIER's (including CARRIER's agents' or employees') negligence, be limited to a maximum of Ten Thousand dollars ($10,000.00) of the total amount in Damages that CONTRACTOR paid or otherwise incurred per occurrence. This dollar limit shall not apply to Damages arising out of or in connection with such claims if involving CARRIER's (including CARRIER's agents' or employees') gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions.

14(c). CARRIER shall credit to CONTRACTOR's next Settlement Compensation any amounts due CONTRACTOR under this Section from CARRIER.

15. POSSESSION, ALTERNATIVE USES, AND IDENTIFICATION OF EQUIPMENT.

**15(a).** **Exclusive Possession and Responsibility.** CARRIER shall have exclusive possession, control, and use of the Equipment for the duration of this Agreement. CONTRACTOR may operate the Equipment for another motor carrier or entity during this Agreement only;with the prior written consent of CARRIER only if done under a sublease between CARRIER and the other authorized carrier (including CONTRACTOR, if CONTRACTOR has the requisite motor carrier registration/operating authority(ies) and insurance) pursuant to 49 C.F.R. § 376.12(c)(2), as applicable and the terms of Subsection (b) of this Section. CARRIER shall not sublease the Equipment to another carrier without CONTRACTOR's prior written consent (which consent shall not be unreasonably withheld). CARRIER shall assume complete responsibility for the operation of the Equipment for the duration of this Agreement except when the Equipment is under sublease by CARRIER to another authorized carrier. Any such sublease shall state that the sublessee-carrier shall have exclusive possession, control, and use of the Equipment, and shall assume complete responsibility for the operation of the Equipment, for the duration of the sublease. The foregoing declarations are made solely to conform to FMCSA regulations and shall not be used for any other purposes, including any attempt to classify CONTRACTOR as an employee of CARRIER. Nothing in the provisions required by 49 C.F.R. § 376.12(c)(1) is intended to affect whether CONTRACTOR or its drivers are an independent contractor or an employee of CARRIER. As provided by 49 C.F.R. § 376.12(c)(4), "an independent contractor relationship may exist when a carrier complies with 49 U.S.C. § 14102 and attendant administrative requirements."

**15(b).** **Subleases and Other Alternative Uses of Equipment.** At CONTRACTOR's request, CARRIER may, if CARRIER so chooses with respect to any trip or trips, approve uses of the Equipment to perform transportation services other than on behalf of CARRIER only under the terms and conditions set forth in this Subsection (b). Such other uses may consist of (together, "Alternative Uses of Equipment"): (i) **Sublease** – CARRIER subleases the Equipment (including driving services furnished by CONTRACTOR) to another authorized for-hire motor carrier of property ("Sublease Carrier") for the provision of for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 *et seq.*, to Sublease Carrier's customers pursuant to Sublease Carrier's operating authority; and (ii) **CONTRACTOR Motor Carriage.** CONTRACTOR uses its own motor carrier operating authority to provide for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 *et seq.*, to a shipper (directly or through a motor freight broker).

**15(b)(1).** **CARRIER's Authorization and Release.** To obtain CARRIER's authorization for each Alternative Use of Equipment, CONTRACTOR shall take the following steps before accepting a trip:

**15(b)(1)(A).** **For Alternative Uses of Equipment Involving Subleases.** Have the Sublease Carrier complete, sign, date, and then fax, or scan and email, to CARRIER a sublease in the form appended as **Appendix D** of this Agreement ("Sublease"), together with the Sublease Carrier's certificate of insurance required by Section 5 of the Sublease; and

**15(b)(1)(B).** **For Alternative Uses of Equipment Involving CONTRACTOR Motor Carriage.** Telephone or email CARRIER's dispatch and provide it with valid information about CONTRACTOR and about the trips (dates, times, and city and state of pickup and delivery), and CONTRACTOR shall obtain an oral or emailed release from CARRIER's dispatch. CONTRACTOR shall display the CARRIER release number on the trip sheet submitted to CARRIER after the trip.

**15(b)(2).** **Compensation For All Alternative-Use-of-Equipment Operations.** In connection with a Sublease or other Alternative Use of Equipment, CONTRACTOR agrees that:

**15(b)(2)(A).** CONTRACTOR shall submit any necessary Sublease- or other Alternative Use-related shipping documents to, and obtain settlement compensation directly and exclusively from, Sublease Carrier (in the case of Sublease trips) or the shipper (in the case of CONTRACTOR Motor Carriage). Notwithstanding anything in this Agreement to the contrary, CARRIER shall have no responsibility for collecting freight charges or paying settlement compensation to CONTRACTOR for any Alternative-Use-of-Equipment trip; and

**15(b)(2)(B).** CONTRACTOR shall pay CARRIER the percentage indicated below of gross revenue billed to the customer before any reductions for accessorial charges, fuel surcharges, or any other amounts and before any charge-backs or deductions from settlement compensation ("Gross Revenue") for each Alternative-Use-of-Equipment trip. CONTRACTOR shall furnish CARRIER, with such payment, a copy of the applicable settlement compensation statement and rated freight bill from the Sublease Carrier or, in the case of CONTRACTOR Motor Carriage shipments, a copy of the rated freight bill CONTRACTOR submitted to the shipper or private carrier. If CONTRACTOR fails to make such payments to CARRIER within twenty (20) days of completing the trip, CARRIER shall be authorized to deduct or otherwise recover pursuant to Section 5(a) of this Agreement the amounts for trips performed on CARRIER's behalf under this Agreement:

**15(b)(2)(B)(1).** The percentage, set forth in Section 3 of <u>Appendix A (CONTRACTOR Election Form)</u>, of all gross revenue billed by Sublease Carrier to its customer for a Sublease trip; and

**15(b)(2)(B)(2).** The percentage, set forth in Section 3 of <u>Appendix A (CONTRACTOR Election Form)</u>, of all gross revenue billed by CONTRACTOR to its customer for an CONTRACTOR Motor Carriage trip.

**15(b)(3).  Carrier's Identification.**

**15(b)(3)(A).** <u>Subleases.</u> For the duration of any Sublease, CONTRACTOR shall remove or cover up all of CARRIER's identification on the Equipment and display instead the Sublease Carrier's identification; and

**15(b)(3)(B).** <u>CONTRACTOR Motor Carriage.</u> For any trip under CONTRACTOR's own operating authority to provide for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49, U.S.C. §§ 13501 *et seq.*, to a shipper or private carrier, CONTRACTOR shall remove or cover up all of CARRIER's identification on the Equipment and display instead CONTRACTOR's identification. If CONTRACTOR possesses interstate or intrastate operating authority and no other motor carrier booked the shipment, the shipment, even if exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 *et seq.*, shall be deemed to be one involving CONTRACTOR Motor Carriage for purposes of this Subsection (b).

**15(b)(4).  Control of and Responsibility for the Equipment.**  As required by 49 C.F.R. § 376.12(c)(1), CARRIER, except for Sublease trips, shall with respect to the public have exclusive possession, control, and use of the Equipment, and assume complete responsibility for the operation of the Equipment, for the duration of this Agreement. For Sublease trips, CARRIER's sublease to Sublease Carrier shall, in accordance with 49 C.F.R. § 376.22(c)(2), provide that Sublease Carrier shall have exclusive possession, control, and use of the Equipment, and shall assume complete responsibility for the operation of the Equipment, for the duration of the Sublease. In addition, for CONTRACTOR Motor Carriage trips, which also constitute subleasing, CONTRACTOR shall have exclusive possession, control, and use of the Equipment, and shall assume complete responsibility for the operation of the Equipment, for the duration of trip.

**15(b)(5).  Insurance.**  For Alternative-Use-of-Equipment trips, just as for trips performed on behalf of CARRIER, CARRIER's and CONTRACTOR's insurance obligations shall be as set forth in Sections 6(a) and (b) of this Agreement, provided that:

**15(b)(5)(A).** <u>Subleases.</u> As between Sublease Carrier and CARRIER, the sublease shall provide that Sublease Carrier's public liability insurance (bodily-injury/property-damage coverage and environmental restoration coverage) and cargo loss-and-damage insurance shall cover the Equipment for the duration of the Sublease; be in at least such amounts as are required by FMCSA regulations promulgated under 49 U.S.C. § 13906 and by applicable state laws (for public liability insurance, in a combined single limit of not less than the amount set forth in Section 6 of <u>Appendix A (CONTRACTOR Election Form)</u>, with a deductible no greater than the amount set forth in Section 6 of <u>Appendix A (CONTRACTOR Election Form)</u>, for injury or death to any person or for damage to property in any one occurrence); and be primary to any insurance coverages that CARRIER may maintain; and

**15(b)(5)(B).** <u>CONTRACTOR Motor Carriage.</u> With respect to Alternative-Use-of-Equipment trips involving CONTRACTOR Motor Carriage (using CONTRACTOR's own operating authority), CONTRACTOR shall, and hereby warrants that it does, maintain public liability insurance (bodily-injury/property-damage coverage and environmental restoration coverage) and cargo loss-and-damage coverage, in at least such amounts as are required by FMCSA regulations promulgated under 49 U.S.C. § 13906 and by applicable state laws (for public liability insurance, in a combined single limit of not less than the amount set forth in Section 6 of <u>Appendix A (CONTRACTOR Election Form)</u>, with a deductible no greater than the amount set forth in Section 6 of <u>Appendix A (CONTRACTOR Election Form)</u>, for injury or death to any person or for damage to property in any one occurrence), covering the Equipment for the duration of the Alternative-Use-of-Equipment trips. CONTRACTOR shall provide a valid certificate of insurance evidencing such coverages to CARRIER before accepting any Alternative-Use-of-Equipment trips involving CONTRACTOR Motor Carriage. On such trips, as between CONTRACTOR and CARRIER, CONTRACTOR's public-liability insurance and cargo loss-and-damage insurance policies shall be primary to any insurance coverages that CARRIER may maintain.

**15(b)(6).  Remaining Agreement Terms.**  In all other respects, the terms of this Agreement shall apply to CONTRACTOR's Alternative-Use-of-Equipment operations.

**15(c).  Identification of Equipment.**  CONTRACTOR shall apply, before placing the Equipment in CARRIER's service, to the outside of the Equipment such identification as CARRIER may designate in accordance with the requirements of all applicable federal, state, local, or foreign authorities, provided that CONTRACTOR shall first remove any paint, decals, or other items that, in CARRIER's reasonable judgment, would interfere with such identification or be otherwise offensive.  CARRIER shall have the right to place and maintain on the Equipment CARRIER's name and any lettering, advertisement, slogans or designs as CARRIER may choose. CONTRACTOR shall remove such identification at the termination of this Agreement or while operating such Equipment on behalf of any other carrier pursuant to Section 15(b) of this Agreement or for any purpose other than conducting CARRIER's business. CONTRACTOR further agrees to keep the Equipment in clean appearance and identified as described herein, at its expense.  CARRIER agrees that CONTRACTOR may display CONTRACTOR's name and address on the Equipment where required by applicable state law.

## 16.  CONTRACTOR NOT EMPLOYEE OF CARRIER.

**16(a).  In General.**  It is expressly understood and agreed that CONTRACTOR is an independent contractor for the Equipment and driver services provided pursuant to this Agreement.

**16(b).  Certification of Status.**  CONTRACTOR shall provide necessary documentation and apply for certification of its independent-contractor status where mandated by applicable state law, including but not limited to, the State of South Dakota.

**16(c).  Selection of Equipment, Maintenance, and Routes.**  Subject only to all Applicable Law and safety considerations, it shall be the sole responsibility of CONTRACTOR to select, purchase or lease, and finance the Equipment; to decide when, where, and how maintenance and repairs are to be performed on the Equipment; and to select all routes and decide all meal, rest, and refueling stops, *provided that* to meet CARRIER's customers' demands, CONTRACTOR agrees to make timely and safe deliveries of all loads, and also agrees to notify CARRIER when delivery has been made or when delivery will be delayed for any reason.

**16(d).  CONTRACTOR's Workers.**  Subject again only to all Applicable Law and safety considerations, CONTRACTOR hereby assumes full control and responsibility for the selection, training, hiring, setting of grooming and dress standards, disciplining, discharging, setting of hours, meal and rest breaks, wages, and salaries, providing for unemployment insurance, state and federal taxes, fringe benefits, workers' compensation insurance (or, if CONTRACTOR prefers, occupational accident insurance where both state law allows and CARRIER approves), adjustment of grievances, all acts and omissions, and all other matters relating to or arising out of CONTRACTOR's use or employment of drivers, drivers' helpers, and other personnel to perform any aspect of this Agreement.  No person CONTRACTOR may engage shall be considered CARRIER's employee. CONTRACTOR shall be solely responsible for complying with any and all state, federal, local, and foreign laws applicable to the terms and conditions of employment of CONTRACTOR's employees or applicants for employment, including, without limitation, compliance with the Federal Fair Credit Reporting Act; verification of immigration and naturalization status; proof of proper taxpayer identification number; proof of highway use tax being currently paid when the CONTRACTOR purchases its license; proof of payment of income; unemployment; Medicare and other state and federal payroll taxes; and, other required withholdings for CONTRACTOR's employees. CONTRACTOR's performance of these responsibilities shall be considered proof of its status as an independent contractor in fact.

**16(e).  Taxes.**

**16(e)(1).  CONTRACTOR's Form of Business and Agreement to File Returns and Pay Taxes.**  As an independent contractor, CONTRACTOR is free to choose the form in which to operate CONTRACTOR's business. CONTRACTOR shall file all federal, state, local, and foreign income, withholding, employment, and federal heavy vehicle use tax forms and returns that CONTRACTOR may be required by law to file, on account of CONTRACTOR and all drivers, drivers' helpers, and other workers used by CONTRACTOR in the performance of this Agreement at the time and place that may be specified in the applicable federal, state, local, and foreign laws, and to pay when due all taxes and contributions reported in such forms and returns. In that regard, CONTRACTOR knows:

**16(e)(1)(A).**  Of CONTRACTOR's responsibilities to pay estimated social security taxes and state and federal income taxes with respect to remuneration received from CARRIER;

**16(e)(1)(B).**  That the social security tax CONTRACTOR must pay is higher than the social security tax the individual would pay if he or she were an employee; and

**16(e)(1)(C).**   That the service provided by CONTRACTOR to CARRIER pursuant to this Agreement is not work covered by the unemployment compensation laws of any state, including Georgia; provided, however, that should CONTRACTOR employ or use drivers, helpers, or other workers to fulfill its obligations under this Agreement, and such drivers, helpers, or other workers are covered by the unemployment laws of any state, including Georgia, CONTRACTOR is solely responsible for providing unemployment insurance for such drivers, helpers, or other workers.

**16(e)(2).   Access to CONTRACTOR's Tax Records.**  CONTRACTOR agrees to furnish CARRIER such evidence of compliance with the foregoing as CARRIER shall reasonably require, including but not limited to proof of income and payroll taxes currently paid by CONTRACTOR (including as provided in Subsection (f) below) or withheld by CONTRACTOR from the wages of its drivers and other workers.

**16(e)(3).   CONTRACTOR's Required Submission of IRS Form 4669 to CARRIER.**  CARRIER shall, itself or through an agent, file federal income tax IRS Form 1099s with the Internal Revenue Service with respect to CONTRACTOR if the amount of compensation CARRIER pays CONTRACTOR during a calendar year reaches the level at which federal law requires such forms to be filed.  For each Form 1099 filed, CARRIER shall, itself or through an agent, furnish CONTRACTOR with both a copy of the completed Form 1099 and a copy of IRS Form 4669, entitled "Statement of Payments Received" on which CARRIER shall have filled in CONTRACTOR's name and address as "Payee" (Line 1), CONTRACTOR's Social Security Number or Federal Taxpayer ID Number (Line 2), CARRIER's name and address as "Payor" (Line 3), the Calendar Year for which the Form 1099 was filed (Line 4), and the "Amount of Payments [to CONTRACTOR] on Which Income Tax and Social Security Tax Were Not Withheld" by CARRIER [the amount reported on the Form 1099] (Line 5).  **CONTRACTOR shall fill out the remaining Lines 6, 7 (if applicable), 8, 9, and 10, sign (Line 11), and date (Line 12) of the Form 4669, and mail or otherwise deliver the original signed form to CARRIER or CARRIER's designated agent within thirty (30) days of filing, with the IRS, an income tax return or employment tax return relating to the income reported on the Form 1099.**

**16(f).   The Parties' Financial Obligations if Contractor is Determined to Be an Employee.  If, whether on CONTRACTOR's initiative or not, CONTRACTOR is declared to be an employee of CARRIER by any federal, state, local, or foreign court, administrative agency, or other governmental body ("Reclassification Decision"), CONTRACTOR and CARRIER hereby agree that this Agreement shall be rescinded back to the time of its formation and that both parties shall be returned to their respective positions before this Agreement was signed.  Specifically, CONTRACTOR and CARRIER agree that notwithstanding any other provision of this Agreement:**

~~16(f)(1).   CONTRACTOR shall, upon the Reclassification Decision becoming final and no longer appealable, immediately (A) owe CARRIER, for each week or other period this Agreement was in effect, all gross compensation under Section 3 and Appendix B [CONTRACTOR Compensation Rates], less any charge-backs under Section 8(a) of this Agreement, previously paid to CONTRACTOR by CARRIER; (B) shall relinquish all rights in any balances in required or voluntary escrow funds than under CARRIER administration that are traceable to remuneration previously paid to CONTRACTOR by CARRIER; and (C) shall owe CARRIER any cash advances provided by CARRIER to CONTRACTOR that CONTRACTOR used for personal, household, or other expenses not in performance of CONTRACTOR's obligations under this Agreement or that CONTRACTOR retained unspent.  CONTRACTOR shall be entitled to deduct from these amounts any expenses (including, for Equipment, other equipment, or tools used in performing work for CARRIER, any actual rent or installment-purchase payments made by CONTRACTOR or, if more, payments that would equal fair-market rent for items of similar kind, age, and condition) CONTRACTOR incurred in performance of CONTRACTOR's obligations under this Agreement that were not covered by charge-backs or paid by CARRIER;~~

**16(f)(2).   CARRIER shall, upon the Reclassification Decision becoming final and no longer appealable, immediately owe CONTRACTOR, for all work activities during each week or other period this Agreement was in effect (including any activities for which CARRIER has not yet paid CONTRACTOR), only the then-applicable federal minimum hourly wage or, if higher, a State's then-applicable minimum hourly wage but only to the extent CONTRACTOR's wage-earning activities occurred in that State, multiplied by CONTRACTOR's total hours actually performing on-duty work for CARRIER, consisting of both driving and non-driving time, under the FMCSA Hours of Service Regulations, 49 C.F.R. Part 395, or under a State's hours of service regulations to the extent applicable.  The total hours worked shall be computed based on any relevant, reliable evidence, which may include estimates or projections based on CONTRACTOR Settlement Statements, driver logs, shipment and/or vehicle tracking data, bills of lading, fuel receipts, toll receipts, and testimony; and**

**16(f)(3).** **Because reclassification of CONTRACTOR's status from independent contractor to employee would fundamentally change the parties' contracting assumptions, either party may, immediately upon initial issuance (even if appealed or appealable) of a Reclassification Decision, terminate this Agreement on one day's notice to the other. The provisions of this Subsection shall be deemed to survive any termination of this Agreement.**

**17.** **COMPLETION OF PERFORMANCE.** If, in CARRIER's judgment, CONTRACTOR has subjected CARRIER to liability because of CONTRACTOR's acts or omissions relating to a shipment, CARRIER may take possession of the shipment entrusted to CONTRACTOR and complete performance. In such event, CONTRACTOR shall waive any recourse against CARRIER for such action and CONTRACTOR authorizes CARRIER to deduct or otherwise recover from CONTRACTOR pursuant to Section 5(a) of this Agreement all direct or indirect costs, expenses, or damages, including attorney's fees, incurred by CARRIER as a result of CARRIER's taking possession of the shipment and completing performance.

**18.** **CONTRACTOR NOT REQUIRED TO PURCHASE PRODUCTS, EQUIPMENT, OR SERVICES FROM CARRIER.** CONTRACTOR is not required to purchase or rent any products, equipment, or services from CARRIER as a condition of entering into this Agreement. If CONTRACTOR elects to purchase or rent equipment from CARRIER or from any third party, for which the purchase or rental contract gives CARRIER the right to make deductions from CONTRACTOR's settlement, the terms of each such contract shall be specified in an Appendix or Addendum to this Agreement.

**19.** **PASSENGER AUTHORIZATION.** As required by 49 C.F.R. § 392.60, CONTRACTOR shall not allow any passengers to ride in the Equipment unless authorized in writing by CARRIER in accordance with that regulation. Before passenger authorization will be given by CARRIER, CONTRACTOR (or its driver) and the passenger requesting authorization shall submit a fully executed Passenger Authorization and Release of Liability form to CARRIER for prior approval, and CONTRACTOR shall have furnished CARRIER a Certificate of Insurance for passenger liability coverage meeting all the requirements of Sections 8(b)(3) and (c) of this Agreement or elected to have CARRIER facilitate and charge back for such coverage. CONTRACTOR agrees not to permit any passenger to operate or be in charge of the Equipment at any time for any purpose whatsoever, or to be outside the truck cab during loading or unloading.

**20.** **LOADING AND UNLOADING.** If the shipper or consignee does not assume loading and unloading responsibilities, CONTRACTOR shall, at CONTRACTOR's expense and with no additional compensation therefor unless otherwise indicated in Appendix B (CONTRACTOR Compensation Rates), be responsible for the loading or unloading of property transported on behalf of CARRIER.

**21.** **CONFIDENTIALITY.** CONTRACTOR hereby recognizes and acknowledges that any list of CARRIER's customers, as it may exist now or from time to time, is a valuable, special and unique asset of the business of CARRIER. CONTRACTOR agrees, during and after the term of this Agreement, not to disclose the list of CARRIER's customers or any part thereof to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever without CARRIER's prior written consent. CONTRACTOR agrees to preserve as "Confidential Matters", all trade secrets, know how and information relating to CARRIER's business, forms, processes, developments, sales and promotional systems, prices and operations, which information may be obtained from tariffs, contracts, freight bills, letters, reports, disclosures, reproductions, books, records, or other contractors, and other sources of any kind resulting from this Agreement. CONTRACTOR agrees to regard such Confidential Matters as the sole property of CARRIER, and shall not publish, disclose or disseminate the same to others without the written consent of CARRIER. In the event of any material breach or threatened material breach by CONTRACTOR of the provisions of this Section, CARRIER shall be entitled to an injunction, restraining CONTRACTOR from disclosing, in whole or in part, the list of CARRIER's customers, and all other Confidential Matters. CONTRACTOR agrees that CARRIER will be irreparably damaged in the event of any material breach of this provision by CONTRACTOR. Accordingly, in addition to any other legal or equitable remedies that may be available to CARRIER, CONTRACTOR agrees that CARRIER will be able to seek and obtain immediate injunctive relief in the form of a temporary restraining order without notice, preliminary injunction, or permanent injunction against CONTRACTOR to enforce this confidentiality provision. CARRIER shall not be required to post any bond or other security and shall not be required to demonstrate any actual injury or damage to obtain injunctive relief from the courts. Nothing hereunder shall be construed as prohibiting CARRIER from pursuing any remedies available to CARRIER at law or in equity for such material breach, including the recovery of monetary damages from CONTRACTOR.

**22.** **BENEFIT AND ASSIGNMENT.** This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors. CONTRACTOR may not assign or subcontract all or a portion of its obligations to another party without the prior written consent of CARRIER. CARRIER shall be authorized to assign or subcontract this Agreement or any rights or obligations hereunder without the prior written consent of CONTRACTOR.

**23.** **NOTICES.** All notices required or permitted by this Agreement shall be in writing (unless permitted elsewhere in this Agreement to be oral) and shall be deemed to have been fully given (a) upon delivery if delivered in person, by facsimile

transmission, or, if both parties have signed Appendix C, by the electronic means specified in that appendix; (b) on the next business day after being deposited with an overnight delivery company with the express charges prepaid; or (c) on the date indicated on the return receipt, or if there is no such receipt, on the third business day after being deposited in the United States Mail with first-class postage prepaid. In each event, the notice shall be properly addressed to the other party at the address or fax number shown at the end of this Agreement or in the manner indicated in Appendix C. CARRIER and CONTRACTOR shall be under a continuing duty to provide a correct address and telephone number to the other party, and CARRIER and CONTRACTOR (if the latter has a fax machine) to provide a correct fax number to the other. Notice of an address, telephone number, or fax-number change shall be given in writing.

24. GOVERNING LAW AND CHOICE OF FORUM. This Agreement shall be governed by the laws of the United States and of the State of Maryland, without regard to the choice-of-law rules of that State or any other jurisdiction. THE PARTIES FURTHER AGREE THAT ANY CLAIM OR DISPUTE ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT OR OTHERWISE WITH RESPECT TO THE OVERALL RELATIONSHIP BETWEEN THE PARTIES, WHETHER UNDER FEDERAL, STATE, LOCAL, OR FOREIGN LAW (INCLUDING BUT NOT LIMITED TO 49 C.F.R. PART 376), SHALL BE BROUGHT EXCLUSIVELY IN STATE OR FEDERAL COURTS SERVING Baltimore County, Maryland  CARRIER AND CONTRACTOR HEREBY CONSENT TO THE JURISDICTION OF SUCH COURTS.

25. FORM OF AGREEMENT AND MISCELLANEOUS PROVISIONS.

25(a). General. The subject headings of the sections and subsections of this Agreement are included for purposes of convenience only and shall not affect the construction or interpretation of any of its provisions. References in this Agreement to CONTRACTOR as "it" and "its" shall be read as "he/she," "him/her," and "his/hers," respectively, if CONTRACTOR is a natural person, rather than a corporation, limited liability company, partnership, or other entity. All dollar amounts specified in this Agreement are based on U.S. Dollars. All references to "days" mean calendar days. This Agreement may be executed in counterparts. Original, faxed, or otherwise-imaged signatures shall be equally valid, as shall assent by the electronic means specified in Appendix C of this Agreement if both parties have signed that appendix.

25(b). Severability. If any provision (including any sentence or part of a sentence) of this Agreement (including its appendixes and addendums) is deemed invalid for any reason whatsoever, this Agreement shall be void only as to such provision, and this Agreement shall remain otherwise binding between the parties. Any provision voided by operation of the foregoing shall be replaced with provisions that shall be as close to the parties' original intent as permitted under applicable law.

25(c). Waiver. No waiver of any of the provisions of this Agreement shall constitute a waiver of any other provisions whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be deemed effective or binding upon either party unless executed in writing by the party making the waiver. The failure or refusal of either party to insist upon the strict performance of any provision of this Agreement or to exercise any right in any one or more instances or circumstances shall not be construed as a waiver or relinquishment of such pro-vision or right, nor shall such failure or refusal be deemed a customary practice contrary to such provision or right.

25(d). Complete Agreement.

25(d)(1). Complete Agreement. This Agreement (including the Appendices and any addendums) shall constitute the entire agreement between CARRIER and CONTRACTOR pertaining to the subject matter contained herein and fully replaces and supersedes all prior and contemporaneous agreements, representations, and understandings, except as provided in Paragraph 2 of this Subsection.

25(d)(2). Credits and Debits Under Previous Agreement Between Parties. Any CONTRACTOR escrow fund balances under any written agreement between the Parties that this Agreement replaces shall be credited to CONTRACTOR's Escrow Fund under this Agreement. All compensation and other amounts due CONTRACTOR from Carrier, and all advances and other amounts due Carrier from CONTRACTOR, pursuant to any such predecessor agreement, shall remain due and payable. The amounts of compensation for trips started, and the amounts of advances and other amounts due Carrier, before the effective date of this Agreement shall be determined under the predecessor agreement; the payment procedures shall be determined under this Agreement; and the payment timing shall be determined under the predecessor agreement or this Agreement, whichever requires payment earlier.

25(d)(3). Amendments. No supplement, modification, or amendment to this Agreement shall be binding unless in writing and signed by both CARRIER and CONTRACTOR (including, if both parties have signed Appendix C, by the electronic means specified in that appendix), except as otherwise provided with respect to deductions in Section 5(c) and insurance deductions in Section 6(f) of this Agreement.

25(e). <u>Copies of This Agreement and Statement of Lease.</u> CARRIER shall, as set forth in 49 C.F.R. § 376.12(l), keep the original of this Agreement, with a copy to be retained by CONTRACTOR. Pursuant to 49 C.F.R. § 376.11(c)(2), a "Statement of Lease" shall be carried on the Equipment for those periods that the Equipment is operated by or for CARRIER under this Agreement.

IN WITNESS WHEREOF, CARRIER and CONTRACTOR hereby sign this Agreement. This Agreement shall begin at 12:01 a.m. Eastern Time on the later of the two dates in the signature block below ("Effective Date") and end at 11:59 p.m. Eastern Time on the next succeeding _____ ("Termination Date").

> By signing below, CONTRACTOR acknowledges that, as reflected in the terms of this Agreement:
>
> - CONTRACTOR is NOT an employee of CARRIER, and all aspects of the relationship between CONTRACTOR and CARRIER are based on CONTRACTOR's status as an independent contractor;
>
> - CONTRACTOR has agreed to be responsible for the operating expenses incurred in connection with his/her business operations;
>
> - CONTRACTOR's agreement to take responsibility for his/her expenses is an indispensable term of this Agreement but for which CARRIER would not have agreed to pay the gross compensation stated above or entered into this Agreement;
>
> - The gross compensation CARRIER agrees to pay is not intended to ensure that CONTRACTOR covers his/her operating expenses, but instead to provide the amount of revenue sufficient, in the relevant market for such services, to convince a contractor-business both to provide, maintain, fuel, legally-credential, and otherwise operate suitable and dependable Equipment and to provide and pay a qualified professional driver or drivers to drive that Equipment; and

CARRIER: COWAN SYSTEMS, LLC

CONTRACTOR:

Check one:
- ☐ Corporation
- ☑ Limited Liability Company
- ☐ Partnership
- ☐ Sole Proprietorship

Organized in State of: _____
With Employer ID No.: ██████████
OR Social Security No.: ██████████

By: _____
Signature

By: _____
Signature

Vivian Ayo
Authorized Rep.'s Name (Typed or Printed)

Jeffery Roberson
Authorized Rep.'s Name (Typed or Printed)

Cowan Representative
Title

██████████
Title

4556 HOLLINS FERRY ROAD
Address (Street, P.O. Box)

Mt. Vernon GA. 30445
Address (Street, P.O. Box)

BALTIMORE, MD  21220
City, State & Zip Code

██████████
City, State & Zip Code

410-247-0800
Mobile Telephone Number          Fax Number

██████████
Mobile Telephone Number          Fax Number

Email Address

██████████
Email Address

01/25/2022
Date

01-26-22
Date

---

### RECEIPT FOR POSSESSION OF CONTRACTED VEHICLE(S)

Received from CONTRACTOR the vehicle or vehicles described in this Agreement.

Equipment received at BALTIMORE, MD on, 2013 at

_04_ : _00_ o'clock _P_ .M.

Cowan Systems, LLC ("CARRIER")

By: _____
   (CARRIER Representative)

_____
Printed Name

---

### RECEIPT FOR RETURN OF CONTRACTED VEHICLE(S)

Received from CARRIER the vehicle or vehicles described in this Agreement in good order.

Equipment received at _____ on _____, 20___ at

_____ o'clock ___.M.

By: _____
   (CONTRACTOR Representative)

_____
Printed Name

## Appendix A

## CONTRACTOR ELECTION FORM

1.   **EQUIPMENT.**  The commercial motor vehicle equipment ("Equipment") governed by this Agreement consists of:

| Equipment Type (Specify Tractor or Trailer) | Year | Make | Model | Serial (VIN) # | CARRIER Unit # |
|---|---|---|---|---|---|
| TRACTOR | 2021 | PETERBILT | 579 | 1XPBDP9X8MD731682 | 2324 |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

## 2.   BASE PLATES, PERMITS, AND FUEL AND MILEAGE TAX REPORTING

2(a).      **Base Plates.**  CONTRACTOR may elect to obtain base plate(s) required by Section 9(e)(1) of this Agreement for CONTRACTOR's Equipment tractor and, if any, CONTRACTOR Equipment trailer by initialing **OPTION 1,** "CONTRACTOR shall obtain own plate...," below under "TRACTOR" and, if applicable, "TRAILER,". Alternatively, CONTRACTOR may initial **OPTION 2** alternatives, "CARRIER shall obtain plate...," below.  Under **OPTION 2,** CARRIER shall initially pay the amount owed to the issuing jurisdiction for the plate(s), and deduct or otherwise recover that expense, plus the administrative fee(s) indicated below to CARRIER, pursuant to Section 5(a) of this Agreement. If this Agreement is terminated prior to CONTRACTOR's complete reimbursement of CARRIER's expense, CARRIER is hereby authorized to deduct any remaining amount from CONTRACTOR's final settlement and/or Escrow Fund.  If CONTRACTOR removes and returns the plate(s) to CARRIER upon the termination of this Agreement and if CARRIER then receives a refund or credit for the plate(s), or resells the plate(s) to another contractor, CARRIER shall refund to CONTRACTOR a prorated share of the amount received by CARRIER, less any transfer or replacement fees owed to the plating jurisdictions;  *CONTRACTOR SHOULD INITIAL ONE OPTION UNDER "TRACTOR" AND ONE OPTION UNDER "TRAILER":*

**TRACTOR –**

_____   **OPTION 1:**      CONTRACTOR shall obtain own plate for CONTRACTOR's Equipment tractor; **OR**

*GK*   **OPTION 2:**      CARRIER shall obtain an apportioned plate under the International Registration Plan for CONTRACTOR's Equipment tractor and deduct or otherwise recover pursuant to Section 5(a) of this Agreement the annual estimated amount CARRIER will owe the issuing jurisdiction for the plate, **$29.00** per week, which shall be adjusted up or down to match the actual amount billed to CARRIER by each July 31.

**TRAILER –**

_____   **OPTION 1:**      CONTRACTOR shall obtain own plate for CONTRACTOR's Equipment trailer; **OR**

_____   **OPTION 2:**      CARRIER shall obtain a base plate for CONTRACTOR's Equipment trailer and deduct or otherwise recover pursuant to Section 5(a) of this Agreement the annual amount CARRIER pays the issuing jurisdiction, $_____, with no administrative fee to CARRIER.

*GK*   **OPTION 3:**      CONTRACTOR elects not to provide a trailer.

2(b).      **Permits and Fuel and Mileage Tax Reporting.**.  Certain governmental permits and licenses, which are the financial responsibility of CONTRACTOR under Section 9(e)(2) of this Agreement, must be maintained, to authorize CONTRACTOR to provide services to CARRIER legally and fuel and mileage tax reporting must be performed under Section 9(f) of this Agreement.

2(b)(1).  **CONTRACTOR-Eligible Permits and Fuel Tax Reporting.**  Under the International Fuel Tax Agreement ("IFTA"), an annual fuel tax permit must be obtained, and quarterly fuel taxes must be reported and paid to the IFTA base state, for the Equipment's operations nationwide.  In addition, certain other permits issued by States are required for CONTRACTOR to operate lawfully in and through their territory. CONTRACTOR may, by initialing the line to the left of **OPTION 1** below, elect to obtain the IFTA permit and all other required permits

(that CONTRACTOR, as opposed to CARRIER, is eligible under Applicable Law to apply for) on CONTRACTOR's own and to perform (or have a third-party vendor perform) all fuel and mileage tax reporting with respect to the Equipment, in accordance with Section 9(f) of this Agreement. Alternatively, CONTRACTOR may, by initialing the line to the left of OPTION 2 below, elect to have CARRIER obtain all these permits and to have CARRIER perform all fuel and mileage tax reporting with respect to the Equipment, in accordance with Section 9(f) of this Agreement, for the flat charge indicated.

### CONTRACTOR SHOULD INITIAL ONE OF THE FOLLOWING TWO OPTIONS:

_____ OPTION 1: CONTRACTOR shall obtain IFTA and all other permits required for operations under this Agreement and that a CONTRACTOR is eligible under Applicable Law to apply for, and CONTRACTOR shall perform all fuel and mileage tax reporting, with respect to the Equipment at CONTRACTOR's expense; OR

_$\mathcal{YR}$_ OPTION 2: CARRIER shall obtain the IFTA permit and all other required permits (that CONTRACTOR, as opposed to CARRIER, is eligible under Applicable Law to apply for), and CARRIER shall perform all fuel and mileage tax reporting services, with respect to the Equipment. CARRIER shall deduct or otherwise recover pursuant to Section 5(a) of this Agreement a flat charge per quarter of $no fee____ per week, comprising the permit fees and CARRIER's tax reporting administrative fee, but not any additional fuel tax that CONTRACTOR may owe.

2(b)(2). CARRIER-Eligible Permits. If CONTRACTOR wishes to be eligible to handle shipments requiring permits or other credentials for which only CARRIER, not CONTRACTOR, is eligible under Applicable Law to apply – such as (currently) the Oregon Weight-Mile Tax, permits to haul hazardous materials in or through the States of CA, CO, ID, MN, NV, OH, or WV (which, individually or through the Alliance, require purchase of hazardous materials transportation permits), or to haul intrastate on CARRIER's behalf in those States that impose initial per-vehicle filing fees for intrastate authority permits – CARRIER shall obtain the permits and deduct or otherwise recover the amount CARRIER paid to the issuing jurisdiction, with no administrative fee to CARRIER, pursuant to Section 5(a) of this Agreement.

2(b)(3). Overdimensional, Other Special, and Temporary Permits. If CONTRACTOR asks CARRIER to obtain an overdimensional, other special, or temporary permit required by Applicable Law for CONTRACTOR to haul a particular shipment or shipments, CARRIER shall deduct or otherwise recover the amount CARRIER paid to the issuing jurisdiction.

2(c). Return of Permits. All permits and licenses issued in CARRIER's name shall be returned to CARRIER upon termination of this Agreement. No refund shall be made to CONTRACTOR by CARRIER of the permit costs upon termination of this Agreement, even if returned permits are reused by CARRIER. CONTRACTOR shall be liable to CARRIER for all expenses incurred by CARRIER due to CONTRACTOR's failure to return all such permits.

2(d). Settlement Deductions for Plates, Permits, and Fuel-Tax Reporting. For all initial permits and the initial quarterly fuel tax reporting fee (not including any additional fuel tax CONTRACTOR may owe, if any, under Section 9(f) of this Agreement), and other items under this Section of this Appendix, CARRIER shall deduct the total expense in equal amounts per week over a 10-week period, beginning the first week of services provided by CONTRACTOR under this Agreement. In addition, CARRIER shall be authorized to otherwise deduct or recover, pursuant to Section 5(a) of this Agreement, the cost of further permits as they are obtained, and subsequent quarterly fuel tax reporting fees at the first settlement in each calendar quarter.

2(e). Itemization Available for Fees. CONTRACTOR may, upon request, obtain an itemization of the fees CARRIER has advanced for CONTRACTOR pursuant to this Section of this Appendix, the portion of the total already paid by CONTRACTOR, and the portion remaining. This itemization shall separately identify each plate amount paid to the issuing jurisdiction, plus CARRIER's administrative fee and any fee to a third-party service, under Section 2(e) above; the costs of each covered individual state permit, CARRIER fuel-reporting charge, and CARRIER's administrative fee; the costs of each CARRIER-Eligible permit fee under Subsection 2(b)(3) above.

3. SPECIFIC DOLLAR AMOUNTS RELATING TO DEDUCTIONS TABLE. The following dollar amounts apply to the corresponding row or item in the Deductions Table in Section 5(a) of this Agreement (for ALL rows below as well as for rows in the Deductions Table not shown below, see the Deductions Table for complete descriptions of the Deduction Item and of the amount or method of computation):

| DEDUCTIONS TABLE – SPECIFIC DOLLAR AMOUNTS | |
|---|---|
| **DEDUCTION ITEM** | **AMOUNT** |
| Advance Check | Per transaction fees charged by issuer of CARRIER's advance checks as published by issuer from time to time. |
| Advances by CARRIER's advance card | Per transaction fees charged by issuer of CARRIER's advance cards as published by issuer from time to time. |
| Alternative Use of Equipment payment to CARRIER | 1.  Six percent (6%) of all gross revenue billed by Sublease Carrier to its customer for a Sublease trip; and<br>2.  Six percent (6%) of all gross revenue billed by CONTRACTOR to its customer for a CONTRACTOR Motor Carriage trip. |
| Communications messaging usage fee | Included in Lease payment under Cowan Equipment Leasing, LLC Equipment Lease at the rate of $13.00/week |
| Escrow Fund contributions | Principal Amount:  $12,000.00, to be deducted, pursuant to Agreement § 7(a), at the rate of $.12 per mile, all miles driven, less any amounts owed to Cowan Equipment Leasing, LLC for the security reserve under your Equipment Lease. Mileage to be reported by Contractor and Escrow Contribution to be paid weekly or deducted from weekly settlements under ICOA. |
| Fuel and oil purchases | Share of discounts and rebates retained by CARRIER: 100% |
| Garnishment orders | The lower of $2.00 per order or lien for each payment processed, or such other amount as may be authorized by law |
| Insurance coverages | The following costs of insurance to CONTRACTOR consist of amounts the insurer(s) charged for the required and optional coverages CONTRACTOR selected (and for those required coverages with respect to which CONTRACTOR failed to provide CARRIER proper evidence of CONTRACTOR's purchase and maintenance of them), which costs are subject to possible increases (*see* Agreement § 6(e)):<br><br>Weekly cost (initially):<br><br>1. Non-Trucking Liability Insurance:  **$8.64 per unit of Equipment** (including admin. fee to CARRIER of $2.77) per week<br>2. Occupational Accident Insurance:  **$35.86 per driver** (including admin. fee to CARRIER of $6.32) per week and includes passenger coverage.<br>3. Physical Damage Insurance on Tractor Equipment:  **(4.20% of CONTRACTOR-specified value of Tractor,** including admin. fee to CARRIER of 1.43%) |
| Transponder replacement if lost, stolen, or damaged by CONTRACTOR | $33.00 for EZ Pass transponder |

4.  COMMUNICATIONS EQUIPMENT.

  4(a).  Specified Equipment Types.

    4(a)(1).  Electronic Onboard Recorder *(Make and Model)*:  Qualcomm MCP 110 unit, Serial No: 108622200

**4(a)(2).** Communications Tracking Equipment (Make and Model): Qualcomm MCP 110 unit. Serial No: 106622200

**4(a)(3).**

**4(b).** Communications Tracking Equipment Options. In accordance with Section 9(g)(3) of this Agreement (CONTRACTOR SHOULD INITIAL ONE OF THESE TWO OPTIONS):

OPTION 1: CONTRACTOR shall furnish and install his/her own compatible communications/tracking system in the Equipment tractor; OR

*QK* OPTION 2: CARRIER shall arrange to have a communications/tracking system installed in the Equipment tractor at CARRIER's expense. IF CONTRACTOR INITIALS THIS OPTION, CONTRACTOR SHALL ALSO SIGN THE ATTACHED RECEIPT.

Under either OPTION 1 or OPTION 2, CARRIER shall deduct or otherwise recover pursuant to Section 5(a) of this Agreement a messaging usage charge in the amount set forth in Section 3 of this Appendix (such amount being based on the average per-truck messaging usage charges to CARRIER by the third-party vendor and including no mark-up or administrative charge benefiting CARRIER).

## 5. INSURANCE.

**5(a).** Insurance Limits, Deductibles, and Other Specifics.

**5(a)(1).** CARRIER's Personal Injury/Property Damage Insurance: Carrier has valid self-insurance authority from FMCSA in the amount of $260,000. Carrier shall also have a combined single limit of not less than Four Million Seven Hundred Fifty Thousand dollars ($4,750,000.00,) excess policy for injury or death to any person (including a passenger) or for liability for damage to property in any one occurrence, with a deductible for personal-injury or property-damage claims no greater than One Hundred Fifty Thousand dollars ($150,000.00).

**5(a)(2).** CONTRACTOR's Non-Trucking Liability Insurance shall have a combined single limit of not less than One Million Dollars ($1,000,000.00) for injury or death to any person or for damages to property in any one occurrence with a deductible no greater than zero dollars ($0.00).

**5(a)(3).** CONTRACTOR's Workers' Compensation Insurance shall provide principal coverage in the State of Maryland.

**5(a)(4).** CONTRACTOR's Passenger Insurance shall provide coverage to CONTRACTOR equivalent to the coverage provided by the policies described in Section 5(b) 2 below, whenever the Equipment is being operated (whether or not on behalf of CARRIER) to any persons riding as a passenger in the Equipment.

**5(a)(5).** CONTRACTOR's Other Insurance. The State in which CARRIER's insurance policies are delivered and under whose law CONTRACTOR, pursuant to Section 6(b)(4) of this Agreement, authorizes CARRIER to waive, reject, or reduce no-fault, uninsured, and underinsured motorist coverage from CARRIER's insurance policies is Maryland.

**5(b).** Certificate of Insurance. CONTRACTOR hereby requests CARRIER, through its insurer, to facilitate on CONTRACTOR's behalf (if they are available) the insurance coverages CONTRACTOR has selected by placing CONTRACTOR's initials in the right-hand column below:

| TYPE OF COVERAGE | INITIAL "YES" TO REQUEST COVERAGE |
|---|---|
| **1. Non-Trucking Liability Insurance:** | |
| Name of Insurer: _Great American Insurance | *QK* YES |
| Policy No: GTP 3943816 | ____ NO |
| Effective Date(s) of Coverage: From the effective date (below) of this Certificate of Insurance through the next succeeding anniversary, and each subsequent annual renewal period, subject to CONTRACTOR's payment of insurance cost and other policy terms and conditions | |

| TYPE OF COVERAGE | INITIAL "YES" TO REQUEST COVERAGE |
|---|---|
| *Amount of Coverage:* $1,000,000.00 combined single limit per occurrence<br><br>*Current Cost to CONTRACTOR:* $8.54 per unit of Equipment, per weekly settlement (including $2.77 administrative fee)<br><br>*Deductible for Which CONTRACTOR is Liable:* N/A per occurrence | |
| 2.  Occupational Accident Insurance:<br><br>*Name of Insurer:* Great American Insurance Group<br><br>*Policy No:* OA 3278542<br><br>*Effective Date(s) of Coverage:* From the effective date (below) of this Certificate of Insurance through the next succeeding anniversary, and each subsequent annual renewal period, subject to CONTRACTOR's payment of insurance cost and other policy terms and conditions<br><br>*Amount of Coverage:* See attached summary of benefits<br><br>*Current Cost to CONTRACTOR:* $35.86 per weekly settlement (including $6.32 administrative fee)<br><br>[COVERAGE IS AVAILABLE ONLY TO A SOLE PROPRIETOR   CONTRACTOR WHO IS EXCLUSIVE DRIVER OF THE EQUIPMENT.]<br><br>*Deductible for Which CONTRACTOR is Liable:* See attached summary of benefits | *JK* ☑ YES<br><br>_____ NO |
| 3.  Physical Damage Insurance on Tractor:<br><br>*Name of Insurer:* Great American Insurance Group<br><br>*Policy No:* GTP 3943816<br><br>*Effective Date(s) of Coverage:* From the effective date (below) of this Certificate of Insurance through the next succeeding anniversary, and each subsequent annual renewal period, subject to CONTRACTOR's payment of insurance cost and other policy terms and conditions<br><br>*Amount of Coverage:* CONTRACTOR-specified value of tractor or straight truck of $_____ (any tractor or straight truck claims, however, will be paid at only the fair market value of insured tractor or straight truck at time of occurrence, in accordance with insurance policy)<br><br>*Current Cost to CONTRACTOR:* 3.98% annually, billed weekly, of CONTRACTOR-specified value of tractor (including 1.43% in admin. fee to CARRIER)<br><br>*Deductible for Which CONTRACTOR is Liable:* $1,000.00 per occurrence | *JK* ☑ YES<br><br>_____ NO |

6. **ALTERNATIVE USES OF EQUIPMENT:** "Insurance Limits and Deductibles." The insurance limits and deductible amounts in Sections 15(b)(5)(A) and (B) of this Agreement shall be not less than Two Million dollars ($2,000,000.00) and no greater than Five Thousand dollars ($5,000.00), respectively.

THIS APPENDIX A is agreed to by the undersigned parties as of the latest date set forth below.

CARRIER: COWAN SYSTEMS, LLC

By: _____
Signature

Vivian Ayo
Authorized Rep.'s Name (Typed or Printed)

NATIONAL ROAD
Title

01/25/2022
Date

CONTRACTOR:

Social Security or Employer ID No.

By: _____
Signature

Jeffery Roberson
Name (Typed or Printed)

01-26-22
Date

## COMMUNICATIONS TRACKING SYSTEM RECEIPT

CONTRACTOR hereby acknowledges that the Qualcomm MCP 110 unit, serial No 108622200 owned by CARRIER, is installed in CONTRACTOR's tractor Equipment Vin# 1XPBDP9X8MD731682.

### Each System Unit:

    1    Outdoor Unit (Antenna)
    1    Communications Unit (Black Box)
    1    Display Unit (Keyboard and Screen)

## MOBILE COMPUTING PLATFORM IN-CAB SCANNER

CONTRACTOR hereby acknowledges that the Omnitracs In-Cab scanner, serial no. _____ owned by CARRIER, is issued to the CONTRATOR to be used in tractor Equipment Vin #: _____.

### Each System Unit:

    1    SCANNER – Part #:
    1    SCANNER CABLE – Part #:
    1    HOLSTER – Part #:

CONTRACTOR:

By: _____
Signature

Jeffery Roberson
Name (typed or Printed)

01-26-22
Date

## Appendix B

## CONTRACTOR COMPENSATION RATES

1. **CONTRACTOR'S GROSS COMPENSATION:** As the total gross compensation for the use of the Equipment and for everything furnished, provided, done by, or required of CONTRACTOR in connection with this Agreement, including but not limited to, driving of the Equipment and all non-driving activities such as conducting pre- and post-trip inspections of the Equipment, waiting to load or unload (detention), loading or unloading if required, fueling, repairing and maintaining the Equipment, hooking and unhooking empty trailers, preparing logbooks and other paperwork, and other activities and services, CARRIER shall pay CONTRACTOR Base Compensation plus Additional Compensation as follows:

1(a). **Base Compensation:** $0.90 per mile for all loaded and empty miles operated under CARRIER dispatch (as specifically directed or authorized by CARRIER), based on CARRIER's most current (at the time of CONTRACTOR's trip) version of P C Miler Shortest Miles computerized mileage guide, which CARRIER shall make available for viewing and printing of particular CONTRACTOR-requested point-to-point mileage calculations at any CARRIER terminal during normal business hours.

| Contractor Tenure | Empty RPM | Loaded RPM |
|---|---|---|
| Start to 3 months | $.90 | $1.05 |
| 3 months to 12 months | $.90 | $1.07 |
| 12 months to 24 months | $.90 | $1.09 |
| 24 months to 36 months | $.90 | $1.11 |
| 36 months to 48 months | $.90 | $1.13 |
| 48 months to 60 months | $.90 | $1.15 |
| 60 months plus | $.90 | $1.16 |

**Northeast Pay** – Any driver destined to the following states: New York, Massachusetts, Connecticut, Rhone Island, New Hampshire, & Maine. Will receive an additional .02 cents per LOADED mile inbound/destined to the states listed above. When departing these states you revert to your normal pay scale.

1(b). **Additional Compensation.**

1(b)(1). **Accessorial Service Charges.** The following compensation for accessorial services shall be paid to CONTRACTOR:
1(b)(1)(A). Detention. Detention will be paid at 70% of the detention charge billed to Customer. When customer agreement does not allow detention to be billed, detention will be paid at $25.00/hour, after 2 free hours. Layover pay will be added when appropriate;
1(b)(1)(B). Loading and unloading $45.00
1(b)(1)(C). Lumper fees. Reimbursed at 100%
1(b)(1)(D). Driver Assisted loading/unloading: $20.00
1(b)(1)(E). Tolls, scales; Reimbursed at 100% or pre-paid with EZ Pass
1(b)(1)(F). Stop off Charge $35.00 per stop

1(b)(2). **Fuel-Related Additional Compensation.** Fuel surcharge based on attached fuel surcharge schedule. Fuel Surcharges are payable on all loaded miles only.

## 2. CHANGES IN COMPENSATION.

2(a). **Temporary Change.** CARRIER and CONTRACTOR may make a temporary change in CONTRACTOR's compensation to be paid for one or more services relating to a shipment or shipments under this Agreement by both parties' signing (either manually or, as indicated in Subsection (b) of this Section, electronically) an addendum, setting forth the change in advance of any hauling assignments to which the change will apply. CONTRACTOR shall be under no obligation to accept the change in compensation by signing such an addendum, and CARRIER shall not terminate this Agreement for CONTRACTOR's failure to do so (except to the extent the procedure below for an "Ongoing Change" is followed), although, in such event, CARRIER is hereby authorized not to assign CONTRACTOR loads covered by such change in the meantime. Such temporary change shall not be effective for more than fifteen (15) days.

**2(b).** **Ongoing Change.** If any aspect of CONTRACTOR's compensation will be changing on an ongoing basis, CARRIER shall provide CONTRACTOR a proposed addendum containing the change at least fifteen (15) days in advance by hand, fax, overnight delivery, U.S. First Class Mail, or if the parties have agreed to such forms of communication by both signing Appendix C of, or a similar addendum to, this Agreement, by the electronic means specified in that appendix. If CONTRACTOR wishes to continue operating on CARRIER's behalf, CONTRACTOR shall, by the effective date and time shown on the addendum, consent to the change by either manually signing the addendum and delivering it to CARRIER by hand, fax, overnight delivery, OR, if both parties have signed Appendix C of, or a similar addendum to, this Agreement, by signing the addendum by the electronic means specified in that appendix. If CONTRACTOR does not take one of these actions consenting to the change within the time indicated on the addendum, the addendum shall operate as a notice of termination under Section 2 of this Agreement, and this Agreement shall terminate as of the date and time set forth on the addendum; provided that, in such event, CONTRACTOR shall not be subject, either before or after termination, to the change(s) proposed in the addendum.

**2(c).** **Addenda.** CARRIER shall promptly deliver to CONTRACTOR a paper copy of each executed addendum, which, if CONTRACTOR signed electronically, shall show the fact and date of CONTRACTOR's electronic approval. CONTRACTOR shall then attach the executed addendum to this Agreement.

**3. EARNINGS ADJUSTMENTS.**

**3(a).** **Billing Error.** If CARRIER discovers and corrects an error in, or in CARRIER's sole judgment decides to retroactively increase or decrease, the amount of any item billed to CARRIER's customer on a shipment that CONTRACTOR hauled and for which CONTRACTOR was compensated pursuant to a percentage of Adjusted Gross Revenue, CARRIER shall credit to, or deduct from, CONTRACTOR's gross compensation at the next settlement a share – corresponding to the percentage of such revenue normally payable to CONTRACTOR for the shipment – of the additional amount CARRIER actually collects or refunds in remedying the error. CARRIER shall provide CONTRACTOR, before or at the time of settlement, with a copy of the amended rated freight bill or a computer-generated document that contains the same information, or, in the case of contract carriage, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill, and shall otherwise meet the requirements of Section 4(b) of this Agreement with respect to the shipment.

**3(b).** **Billed Amount Uncollectible.** If, after making a commercially reasonable effort to do so, CARRIER is unable to collect from a customer the full amount of any item billed to the customer for a shipment that CONTRACTOR hauled and for which CONTRACTOR was compensated pursuant to a percentage of Adjusted Gross Revenue, CARRIER shall deduct from CONTRACTOR's gross compensation at the next settlement a share of the unpaid amount that corresponds to the percentage of such revenue normally payable to CONTRACTOR for the shipment. CARRIER shall give CONTRACTOR, before or at the time of settlement, a written explanation of CARRIER's efforts to collect from its customer and the computation of the amount being deducted from CONTRACTOR's gross compensation, Escrow Fund, and any other amounts due CONTRACTOR from CARRIER.

**4.**
**TIMING AND METHOD OF PAYMENT OF SETTLEMENT COMPENSATION.** CARRIER shall perform a compensation settlement every WEEK. Settlement will be funded on Friday by close of business for all loads for which the required documents are received by CARRIER by midnight on the previous Sunday. If pay date falls on Christmas Day, New Year's Day, Memorial Day, Independence Day, Labor Day or Thanksgiving Day, settlement will be funded on the next following business day. CARRIER shall pay Settlement Compensation (with CARRIER charging no administrative fee) by making an electronic direct-deposit onto CONTRACTOR'S COMDATA Card, or into CONTRACTOR's bank account in accordance with a CARRIER-supplied form that CONTRACTOR shall complete.

**THIS APPENDIX B is agreed to by the undersigned parties as of the latest date set forth below.**

CARRIER: COWAN SYSTEMS, LLC

By: _____
   Signature

Vivian Avo
Authorized Rep.'s Name (Typed or Printed)

NATIONAL ROAD
Title

01/25/2022
Date

CONTRACTOR:

Social Security or Employer ID No. _____

By: Jeffery Roberson
   Signature

Jeffery Roberson
Name (Typed or Printed)

01-26-22
Date

# Fuel Surcharge Program for Lease Purchase Owners

Peg      1.300
Range    0.060

| Fuel Price Range | | Fuel Surcharge | Fuel Price Range | | Fuel Surcharge |
|---|---|---|---|---|---|
| 0.010 | 1.299 |  | 2.980 | 3.039 | 0.29 |
| 1.300 | 1.359 | 0.01 | 3.040 | 3.099 | 0.30 |
| 1.360 | 1.419 | 0.02 | 3.100 | 3.159 | 0.31 |
| 1.420 | 1.479 | 0.03 | 3.160 | 3.219 | 0.32 |
| 1.480 | 1.539 | 0.04 | 3.220 | 3.279 | 0.33 |
| 1.540 | 1.599 | 0.05 | 3.280 | 3.339 | 0.34 |
| 1.600 | 1.659 | 0.06 | 3.340 | 3.399 | 0.35 |
| 1.660 | 1.719 | 0.07 | 3.400 | 3.459 | 0.36 |
| 1.720 | 1.779 | 0.08 | 3.460 | 3.519 | 0.37 |
| 1.780 | 1.839 | 0.09 | 3.520 | 3.579 | 0.38 |
| 1.840 | 1.899 | 0.10 | 3.580 | 3.639 | 0.39 |
| 1.900 | 1.959 | 0.11 | 3.640 | 3.699 | 0.40 |
| 1.960 | 2.019 | 0.12 | 3.700 | 3.759 | 0.41 |
| 2.020 | 2.079 | 0.13 | 3.760 | 3.819 | 0.42 |
| 2.080 | 2.139 | 0.14 | 3.820 | 3.879 | 0.43 |
| 2.140 | 2.199 | 0.15 | 3.880 | 3.939 | 0.44 |
| 2.200 | 2.259 | 0.16 | 3.940 | 3.999 | 0.45 |
| 2.260 | 2.319 | 0.17 | 4.000 | 4.059 | 0.46 |
| 2.320 | 2.379 | 0.18 | 4.060 | 4.119 | 0.47 |
| 2.380 | 2.439 | 0.19 | 4.120 | 4.179 | 0.48 |
| 2.440 | 2.499 | 0.20 | 4.180 | 4.239 | 0.49 |
| 2.500 | 2.559 | 0.21 | 4.240 | 4.299 | 0.50 |
| 2.560 | 2.619 | 0.22 | 4.300 | 4.359 | 0.51 |
| 2.620 | 2.679 | 0.23 | 4.360 | 4.419 | 0.52 |
| 2.680 | 2.739 | 0.24 | 4.420 | 4.479 | 0.53 |
| 2.740 | 2.799 | 0.25 | 4.480 | 4.539 | 0.54 |
| 2.800 | 2.859 | 0.26 | 4.540 | 4.599 | 0.55 |
| 2.860 | 2.919 | 0.27 | 4.600 | 4.659 | 0.56 |
| 2.920 | 2.979 | 0.28 | 4.660 | 4.719 | 0.57 |

The US Weekly Average Diesel price can be found at the Department of Energy's web site below. The weekly average is updated every Monday at 4:00 p.m.

http://www.eia.gov/petroleum/gasdiesel/

## Appendix C

## CONSENT TO CONDUCT BUSINESS USING ELECTRONIC METHODS

1.   Pursuant to Regulatory Guidance Concerning Electronic Signatures and Documents, 74 Fed. Reg. 411 (Jan. 4, 2011), issued by the Federal Motor Carrier Safety Administration ("FMCSA"), COWAN SYSTEMS, LLC ("CARRIER") and the undersigned contractor ("CONTRACTOR") hereby consent and agree to conduct business using, to the extent either party elects to do so in a particular instance, the following electronic method: *facsimile transmission, email, SMS messaging, and Qualcomm total mail messaging.*

2.   This consent encompasses the use of electronic methods to transmit and effect the signature of any document, including, without limitation, any supplement, modification, addendum, amendment, notice, consent and/or waiver, required by this Agreement or required by FMCSA regulations to be generated and maintained (or exchanged by private parties), including, without limitation, driver applications, driver histories, and other qualification records, leases formed under 49 C.F.R. Part 376, driver-vehicle inspection reports, and records of duty status.

3.   The parties agree that when CONTRACTOR uses the above electronic method to effect electronic signatures, the method: (1) identifies and authenticates CONTRACTOR as the source of the electronic communication; (2) indicates CONTRACTOR's approval of the information contained in the electronic communication; and (3) produces an electronic document with the same integrity, accuracy, and accessibility as a paper document or handwritten signature.

4.   The parties agree that when CARRIER uses the above electronic method to effect electronic signatures, the method: (1) identifies and authenticates CARRIER as the source of the electronic communication; (2) indicates CARRIER's approval of the information contained in the electronic communication; and (3) produces an electronic document with the same integrity, accuracy, and accessibility as a paper document or handwritten signature.

5.   Either party may elect, with respect to any document, to use a manual/hardcopy signature, provided that such election shall not preclude the other party from applying an electronic signature to the same document.

THIS APPENDIX is agreed to by the undersigned parties as of the latest date set forth below.

CONTRACTOR: *Jeffery Roberson*
Name (Typed or Printed)

If Sole Proprietor: ▓▓▓▓▓▓▓▓▓▓▓▓
Social Security No.

If Corp., Prtnrship, or LLC: _____
Fed. Taxpayer ID No.

By: *Jeffy Robev*
Signature

*Jeffery Roberson*
Name (Typed or Printed)

▓▓▓▓▓▓▓▓▓▓
Address

*Mt Vernon GA 30445*
City, State & Zip Code

_____  _____
Mobile Telephone Number    Fax Number

Email Address

*01-26-22*
Date

CARRIER: COWAN SYSTEMS, LLC

By: _____
Signature

Vivian Avo
Authorized Rep.'s Name (Typed or Printed)

NATIONAL ROAD
Title

4555 HOLLINS FERRY ROAD
Address (Street, P.O. Box)

BALTIMORE, MD 21220
City, State & Zip Code

410-247-0800
Mobile Telephone Number    Fax Number

Email Address

01/25/2022
Date

## APPENDIX D

### SUBLEASE OF EQUIPMENT LEASED TO

Through this agreement ("Sublease"), the undersigned _____ ("Sublease Carrier") agrees to lease from Cowan Systems, LLC ("CARRIER"), and CARRIER to lease to Sublease Carrier, the following commercial motor vehicle equipment ("EQUIPMENT"), currently under lease from _____ ("CONTRACTOR"):

| CONTRACTOR'S EQUIPMENT | CARRIER UNIT # | YEAR | MAKE | MODEL | SERIAL (VIN) # | BASE PLATE # |
|---|---|---|---|---|---|---|
| Tractor | | | | | | |

1.  **TERM.** Absent default, this Sublease shall begin at the time(s) set forth on completed EQUIPMENT Receipt(s), in the form attached hereto, that Sublease Carrier shall furnish to CARRIER ("Effective Date"), and end when possession of the EQUIPMENT is returned to CARRIER. This Sublease may be terminated at any time for any reason by either party on oral, followed by written, notice of termination to the other party. If, up to and including the date of termination, one or more events occur that give rise, before or after that date, to a liability or entitlement of Sublease Carrier of CARRIER under this Sublease, such liability or entitlement shall continue, notwithstanding the termination of this Sublease, until such liability or entitlement is satisfied in full.

2.  **IDENTIFICATION OF EQUIPMENT.** Sublease Carrier shall ensure that for the duration of the Sublease, the identification of equipment requirements in 49 C.F.R. § 376.11(c) are complied with by removing or covering up all of CARRIER's identification on the EQUIPMENT and displaying instead Sublease Carrier's identification.

3.  **CONTROL AND RESPONSIBILITY.** Sublease Carrier shall have exclusive possession, control, and use of the EQUIPMENT, and shall assume complete responsibility for the operation of the EQUIPMENT, for the duration of the Sublease from the time possession is taken by the Sublease Carrier and the receipt required under 49 C.F.R. § 376.11(b) is given to CARRIER until possession of the EQUIPMENT is returned to CARRIER. The foregoing declarations are made in order to comply with FMCSA regulations (49 C.F.R. § 376.12(c)(1)) and shall not be used to classify CONTRACTOR as an employee of Sublease Carrier or CARRIER. As 49 C.F.R. § 376.12(c)(4) provides, nothing in the provisions required by 49 C.F.R. § 376.12(c)(1) is intended to affect whether CONTRACTOR and CONTRACTOR's drivers are independent contractors or employees of Sublease Carrier or CARRIER and "an independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. §:14102 and attendant administrative requirements";

4.  **INDEMNIFICATION.** Sublease Carrier shall defend, indemnify, and hold harmless CARRIER from any claim (including any for which CARRIER is not indemnified by CARRIER's insurance and any claim of loss of or damage to the EQUIPMENT or to CARRIER's other property) of loss, damage, delay, fine, civil penalty, or expense, including reasonable attorney's fees and costs of litigation (together "Damages") that CARRIER pays or otherwise incurs arising out of or in connection with the Sublease Carrier's or CONTRACTOR's (including their respective agents' or employees') negligence, gross negligence, willful misconduct, or other culpable acts or omissions;

5.  **INSURANCE.** Sublease Carrier agrees to, and warrants that it does, maintain public liability insurance (bodily-injury/property-damage coverage and environmental restoration coverage) and cargo loss-and-damage coverage, in at least such amounts as are required by Federal Motor Carrier Safety Administration regulations promulgated under 49 U.S.C. § 13906 and pursuant to applicable state laws, covering the EQUIPMENT for the duration of this Sublease. Such insurance coverages shall be primary, as between Sublease Carrier and CARRIER, to any insurance coverages that CARRIER may maintain. Sublease Carrier shall evidence such insurance coverages by furnishing to CARRIER, along with this executed Sublease, a valid certificate of insurance.

6.  **SUBLEASE CARRIERS' COMPENSATION OF CONTRACTOR.** Sublease Carrier shall enter into an independent contractor operating agreement with CONTRACTOR regarding compensation (including the sublease payments owed to CARRIER pursuant to Section 7 below) and other terms that complies with the Federal Truth-in-Leasing Regulations, 49, C.F.R. Part 376, and shall pay CONTRACTOR the agreed compensation, within (fifteen) 15 days after CONTRACTOR submits to Sublease Carrier the driver log books required by the U.S. Department of Transportation and those documents necessary for Sublease Carrier to secure payment of freight charges from the shipper (together "Sublease Trip Documents").

**7.     SUBLEASE PAYMENTS.** As consideration for this Sublease, Sublease Carrier shall remit to CONTRACTOR at the same time Sublease Carrier pays compensation to CONTRACTOR for a trip, and CONTRACTOR has agreed to remit the same amount to CARRIER, _____ percent (__%) of all Gross Revenue billed by the Sublease Carrier to Sublease Carrier's customer for each load handled by CONTRACTOR under the Sublease, before any reductions for accessorial charges, fuel surcharges, or any other amounts and before any deductions from compensation.  For each such trip, Sublease Carrier shall furnish to CONTRACTOR for forwarding to CARRIER a copy of the rated freight bill that Sublease Carrier sent to Sublease Carrier's customer.

**8.     INDEPENDENT CONTRACTOR RELATIONSHIP.** It is the intent of the parties to this Sublease that Sublease Carrier, CARRIER, and CONTRACTOR shall all be independent contractors.

**9.     COPY OF SUBLEASE.** Sublease Carrier shall ensure that a copy of the Sublease is carried in the EQUIPMENT for the duration of the Sublease.

**10.     GENERAL.** If any provision (including any sentence or part of a sentence) of this Sublease (including its attachments and addendums) is deemed invalid for any reason whatsoever, the Sublease shall be void only as to such provision, and this Sublease shall remain otherwise binding between the parties.  This Sublease (including the Attachments and any addendums) constitute the entire Sublease between CARRIER and Sublease Carrier pertaining to the subject matter contained herein and fully replaces and supersedes all prior and contemporaneous agreements, representations, and understandings.  No supplement, modification, or amendment to this Sublease shall be binding unless in writing and signed by both parties. Original, faxed, or otherwise imaged signatures shall be equally valid.

**11.     GOVERNING LAW AND FORUM.** This Sublease shall be interpreted in accordance with, and governed by, the laws of the United States and, of the State of _____, without regard to the choice-of-law rules of that State or any other jurisdiction. THE PARTIES AGREE THAT ANY CLAIM OR DISPUTE ARISING FROM OR IN CONNECTION WITH THIS SUBLEASE, WHETHER UNDER FEDERAL, STATE, LOCAL, OR FOREIGN LAW (INCLUDING BUT NOT LIMITED TO 49 C.F.R. PART 376), SHALL BE BROUGHT EXCLUSIVELY IN THE STATE OR FEDERAL COURTS SERVING _____. CARRIER AND SUBLEASE CARRIER HEREBY CONSENT TO THE JURISDICTION AND VENUE OF SUCH COURTS.

IN WITNESS WHEREOF, the parties hereby execute this Sublease on this _____ day of _____, 20__.

**CARRIER: COWAN SYSTEMS, LLC**                    **SUBLEASE CARRIER:** _____
                                                   Fed. Taxpayer ID No. _____

By: _____                           By: _____
     Signature                                          Signature

_____                               _____
Authorized Rep.'s Name (Typed or Printed)          Authorized Rep.'s Name (Typed or Printed)

_____                               _____
Title                                              Title

_____                               _____
Address (Street, P.O. Box)                         Address (Street, P.O. Box)

_____                               _____
City, State & Zip Code                             City, State & Zip Code

_____    _____       _____    _____
Mobile Telephone Number    Fax Number              Mobile Telephone Number    Fax Number

_____                               _____
Email Address                                      Email Address

## COWAN SYSTEMS, LLC

### STATEMENT OF LEASE

To the extent provided by the Independent Contractor Operating Agreement entered into between Jeffery Roberson ("ICOA" or "lease"), this Equipment is being operated by the undersigned CARRIER. Contractor is the Equipment's "owner," as the latter term is defined by 49 C.F.R. § 376.2(d). The ICOA is for a term commencing at _08_:_00_ _A_.m. ___ET_____ Time on the _25_ day of _January_, 2022, and ending at 11:59 p.m. _____ Time on the next succeeding _____, unless sooner terminated by either party pursuant to Section 2 of this Agreement and includes no restrictions relative to the commodities to be transported. The original of the ICOA is kept by CARRIER at its headquarters address, shown below.

The undersigned parties to the ICOA agree that, pursuant to 49 C.F.R. § 376.11(c)(2), **A COPY OF THIS "STATEMENT OF LEASE" IS TO BE CARRIED ON THE EQUIPMENT DURING ALL PERIODS THAT, PURSUANT TO THE ICOA, THE EQUIPMENT IS BEING OPERATED BY OR ON BEHALF OF CARRIER.**

**CARRIER:   COWAN SYSTEMS, LLC**

By: _____
Signature

Vivian Ayo
Authorized Rep.'s Name (Typed or Printed)

NATIONAL ROAD
Title

4555 HOLLINS FERRY ROAD
Address (Street, P.O. Box)

BALTIMORE, MD 21220
City, State & Zip Code

410-247-0800
Mobile Telephone Number         Fax Number

_____
Email Address

01/25/2022
Date